942 So.2d 910 (2006)
Melvin Stacy JENKINS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-1780.
District Court of Appeal of Florida, Second District.
October 11, 2006.
Rehearing Denied November 22, 2006.
*911 James Marion Moorman, Public Defender, and J.L. "Ray" LeGrande, Special Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Timothy A. Freeland, Assistant Attorney General, Tampa, for Appellee.
ALTENBERND, Judge.
Melvin Stacy Jenkins appeals his judgment and sentence for manslaughter. We conclude that Mr. Jenkins established his claim of self-defense and that the State failed to present legally sufficient evidence to overcome that defense. Accordingly, we reverse the judgment.
Mr. Jenkins is a forty-two-year-old roofer who lived in a run-down mobile home park in Hillsborough County. He and his family rented two small trailers that were divided by a narrow driveway between them. He lived in one trailer, and his wife, his daughter, and his son lived in the other. Mr. Jenkins was charged with manslaughter with a deadly weapon, arising out of an altercation with twenty-five-year-old Bryan Cerezo that occurred just outside of Mr. Jenkins' trailers. The altercation ended when Mr. Jenkins inflicted a single, fatal stab wound to Mr. Cerezo.
At trial, the State presented the evidence of three witnesses to this event, all of whom were neighboring residents in the same trailer park and were unrelated to Mr. Jenkins. The first witness was a man who testified with the help of a Spanish interpreter and who described witnessing the entire altercation, including the stabbing, but could not testify about the words spoken between the two men. The second witness was an eighty-year-old man who spoke English and heard some of the words exchanged between Mr. Jenkins and Mr. Cerezo and saw the initial stages of the altercation, but whose view did not permit him to see the knife or the stabbing. The third witness was a man whose view of the altercation was largely obstructed but who overheard some of the words the two men exchanged. Mr. Jenkins testified in his own defense and claimed that the stabbing was done in self-defense. Much of the evidence presented by Mr. Jenkins and the State's witnesses was undisputed, although each witness provided a different perspective of the events.
On March 19, 2004, just before 3 p.m., Mr. Jenkins was in his trailer when his teenage daughter arrived and told him that she had just had a disagreement with a woman at a nearby apartment complex. The nature of this disagreement was never developed at trial. At about this same time, Mr. Jenkins heard someone banging on the door to his wife's trailer. The person banging on the door was Bryan Cerezo. Mr. Jenkins had never met Mr. Cerezo prior to this day, but apparently he learned from his daughter that this was the boyfriend of the woman involved in the disagreement.
*912 Mr. Jenkins called out to Mr. Cerezo and told him that no one was home and that he should quit banging on the door and leave. Mr. Cerezo claimed he was looking for Mr. Jenkins' son and refused to leave, even though Mr. Jenkins asked him repeatedly to do so. Mr. Jenkins was preparing to go to work and had his six-inch sheath knife on his belt. Mr. Jenkins testified, and one of the State's witnesses confirmed, that Mr. Jenkins typically carried this knife on his belt for use in his work. His remaining roofing tools were located by the door.
While he was speaking to Mr. Cerezo, Mr. Jenkins came out of his trailer holding his hammer.[1] Mr. Cerezo continued to verbally confront Mr. Jenkins. The confrontation was loud enough to attract the attention of the three witnesses who testified for the State. These witnesses described Mr. Cerezo as "furious" and "a wild man." Mr. Jenkins testified that Mr. Cerezo was acting like "a lunatic."[2] One eyewitness indicated that Mr. Cerezo looked larger and stronger than Mr. Jenkins.[3] Mr. Cerezo claimed that he was a gang member and that he would come back to the mobile home park with "20 guns and silencers and kill everybody." One of the witnesses testified he heard Mr. Cerezo yelling, "I'm going to kill you. You're a dead man." Another witness heard Mr. Cerezo threaten to burn down Mr. Jenkins' trailer. This latter witness "thought" he heard Mr. Jenkins reply, "Come on." Mr. Jenkins testified that he told Mr. Cerezo "to take his gang banging ass out of there."
Mr. Cerezo told Mr. Jenkins to throw down the hammer and fight like a man. This statement was heard by one of the State's witnesses who saw Mr. Jenkins toss his hammer to the side. At this point, the two men were apparently on the edge or in the common driveway that essentially served as the street for the row of very small trailer lots.[4] According to Mr. Jenkins, he told Mr. Cerezo, "I didn't come down here to fight." Mr. Jenkins testified that Mr. Cerezo took a couple of steps as if he was going to leave and then "just ran right back to me and just blasted me on the side of my head." One witness described this punch as a left-handed one. Another witness saw Mr. Cerezo land this punch. Both of these witnesses saw the resulting cut to the left side of Mr. Jenkins' face, which began to bleed down his face. One of the State's witnesses testified that Mr. Jenkins "just wobbled. His legs wobbled and he just stood there." Another said that Mr. Jenkins did not fall down, but his knees "buckled." One witness saw Mr. Jenkins step back. Mr. Cerezo also backed up after landing this punch.
Mr. Jenkins took out his sheath knife. Only one of the State's witnesses saw the knife, and this witness testified that Mr. Jenkins "showed [Mr. Cerezo] the knife." Mr. Jenkins and one of the other witnesses testified that Mr. Cerezo pulled his shirt open and pulled his arm back behind his *913 body where Mr. Jenkins could not see it. According to Mr. Jenkins, Mr. Cerezo claimed that he had "a Glock" with which he was going to "cap" Mr. Jenkins. Mr. Cerezo then clenched his fist and charged at Mr. Jenkins again. Mr. Jenkins' knife entered the left side of Mr. Cerezo's chest, consistent with Mr. Jenkins raising it with his right hand into a defensive position in response to a left-handed punch. The only witness to actually see the stabbing testified that Mr. Jenkins did not swing the knife, but instead the knife appeared to "kick out" in reaction to the second punch.
Mr. Cerezo backed up, walked a short distance away, collapsed, and died. At this point, one of the witnesses called 911. The medical examiner confirmed that Mr. Cerezo died from a single knife wound that caused fatal injuries to his heart and liver. The six-inch wound was essentially level, with no apparent twisting, and primarily from the left side to the right without a hilt bruise, suggesting that the knife entered the body from a right-handed motion without enough force to thrust the hilt against or into the body.
When Mr. Cerezo collapsed, Mr. Jenkins approached one of the neighbors who had witnessed the event. He told the neighbor that he did not mean to stab Mr. Cerezohe had intended only to "nick" him. Mr. Jenkins fled from the scene but turned himself in several days later when he knew that a warrant was outstanding.
The State presented several diagrams and witnesses to establish that the fight took place in the common driveway and not on "the premises" of either of the two trailer lots rented by the Jenkins family. The State also explored with the witnesses whether Mr. Jenkins might have been able to escape from the confrontation before acting in self-defense. The first witness was asked whether he saw Mr. Jenkins "walk away after the victim punched him," and responded, "He backed up, but the guy gave him another punch." This witness testified that Mr. Jenkins never took a step toward Mr. Cerezo. Another witness testified that Mr. Jenkins might have been able to retreat a couple of feet, but he did not get a chance to because Mr. Cerezo "[came] at him too fast." The prosecutor asked Mr. Jenkins if anyone stopped him from walking away after the first punch, and Mr. Jenkins replied, "Where was I going to walk to?"
Mr. Jenkins made a motion for judgment of acquittal at the end of the State's case and renewed the motion after he presented his defense. The jury was then instructed on the charge of manslaughter with a weapon and other lesser-included charges. The jury received instructions on self-defense. Because there was some question as to where this altercation occurred and whether that location would qualify as the curtilage of Mr. Jenkins' residence, the jury heard instructions on self-defense in general as well as self-defense for situations occurring in a defendant's home.
The jury deliberated more than six hours and asked questions along the way. Ultimately, they found Mr. Jenkins guilty of the lesser offense of manslaughter without a weapon, an apparent partial jury pardon. Mr. Jenkins was sentenced as a habitual offender to twenty-five years' imprisonment, followed by five years' probation.
Pursuant to section 776.012, Florida Statutes (2004), a "person is justified in the use of deadly force only if he or she reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself or another or to prevent the imminent commission of a forcible felony." See also Weiand v. State, 732 So.2d 1044, 1049 (Fla. *914 1999). A person under attack has a duty to "retreat to the wall" before taking a life; the person must have used all reasonable means in his power, consistent with his own safety, to avoid the danger and to avert the necessity of taking human life. Soberon v. State, 545 So.2d 490 (Fla. 3d DCA 1989).
When a person is attacked within his or her own home, however, a different standard applies.
[W]hen a person is in his own home and he or the members of his family are assaulted or placed in apparent imminent danger of great personal injury, he has the right to stand his ground and meet force with force, even to the extent of taking life if he actually believes, and the circumstances and surrounding conditions are such that a reasonably cautious and prudent person would believe, danger of death or great personal injury to be imminent, at the hands of [the] assailant.
Harris v. State, 104 So.2d 739, 743 (Fla. 2d DCA 1958); see also Weiand, 732 So.2d at 1049. In some cases, this "castle doctrine" is described as follows: "[W]hen one is violently assaulted in his own house or immediately surrounding premises, he is not obliged to retreat." See Hedges v. State, 172 So.2d 824, 827 (Fla.1965) (emphasis added).[5]
While the defendant may have the burden of going forward with evidence of self-defense, the burden of proving guilt beyond a reasonable doubt never shifts from the State, and this standard broadly includes the requirement that the State prove beyond a reasonable doubt that the defendant did not act in self-defense. Brown v. State, 454 So.2d 596, 598 (Fla. 5th DCA 1984). If a defendant establishes a prima facie case of self-defense, the State must overcome the defense by rebuttal, or by inference in its case-in-chief. State v. Rivera, 719 So.2d 335, 337 (Fla. 5th DCA 1998) (citing Sneed v. State, 580 So.2d 169, 170 (Fla. 4th DCA 1991)). If the State fails to sustain this burden of proof, the trial court is duty-bound to grant a judgment of acquittal in favor of the defendant. Id. (citing Brown, 454 So.2d at 599). Here, the State did not present evidence sufficient to overcome Mr. Jenkins' claim of self-defense; in fact, the testimony of the State's witnesses supported that defense.
We have struggled with this case nearly as hard as the jury struggled. If Mr. Jenkins had stayed inside his trailer or had returned to his trailer when Mr. Cerezo suggested that he throw down his hammer and fight like a man, and perhaps called the police, it is unlikely that Mr. Cerezo would have died. On the other hand, Mr. Cerezo refused to leave Mr. Jenkins' property and was loudly threatening *915 Mr. Jenkins and his family. Mr. Jenkins' teenage daughter was nearby, and numerous people were apparently watching the altercation but offered no assistance.
Mr. Jenkins was not required to cower in his trailer while Mr. Cerezo threatened him and his family and tried to enter the trailer of Mr. Jenkins' wife and children. Mr. Jenkins was within his right to exit his trailer, stand on the common driveway of the neighboring trailers, and demand that Mr. Cerezo leave. Indeed, defusing such a situation without calling the police may have seemed wise in light of Mr. Cerezo's threats to return with gang members and burn down Mr. Jenkins' trailer or otherwise kill him and his family.
Thus, the issue of self-defense in this case did not arise at the beginning of the verbal confrontation because at that point Mr. Jenkins was not faced with the use of force. This was implicitly acknowledged by the prosecutor, whose questions of retreat focused on the brief moment in time after Mr. Cerezo landed the first punch and drew back. There was no dispute that at this point Mr. Jenkins reasonably believed he was at risk of great bodily harm. Mr. Cerezo had landed a left-handed punch to Mr. Jenkins' face, causing a gash below his eye. Mr. Jenkins "wobbled" from the impact. Nevertheless, Mr. Cerezo pulled back, continued to threaten to kill Mr. Jenkins, and prepared to charge Mr. Jenkins a second time. Even if the jury rejected Mr. Jenkins' testimony that Mr. Cerezo threatened to shoot him with a firearm, the State's witnesses all confirmed that Mr. Cerezo threatened to kill Mr. Jenkins and that he attacked Mr. Jenkins, cutting his face with the first punch.
Further, it was only upon the occurrence of this attack that any "duty to retreat" arose. The State failed to present evidence, however, that Mr. Jenkins could have reasonably retreated from this fight once it began. The State's witnesses testified that during this brief moment in time, there was no reasonable opportunity to retreat. Rather, the eyewitnesses saw Mr. Jenkins "wobbled" and his knees "buckled," and testified that Mr. Jenkins had no time to retreat before Mr. Cerezo charged at him a second time.[6] It was only at this pointfaced with a serious aggressor and no avenue of retreatthat Mr. Jenkins pulled out his knife. Even then, there was no evidence that Mr. Jenkins did anything other than "show" Mr. Cerezo the knife until he was faced with a second attack by Mr. Cerezo.
We have found seven Florida cases in which Florida courts have reversed convictions based upon the State's failure to rebut a prima facie case of self-defense. See Thompson v. State, 552 So.2d 264 (Fla. 2d DCA 1989); Hernandez Ramos v. *916 State, 496 So.2d 837 (Fla. 2d DCA 1986); Rodriguez v. State, 550 So.2d 81 (Fla. 3d DCA 1989); Brown v. State, 454 So.2d 596 (Fla. 5th DCA 1984); Diaz v. State, 387 So.2d 978 (Fla. 3d DCA 1980); Bacom v. State, 317 So.2d 148 (Fla. 1st DCA 1975); see also Fowler v. State, 921 So.2d 708 (Fla. 2d DCA 2006).
In Thompson, 552 So.2d 264, this court reversed a conviction for aggravated battery when the defendant, who had a gun in his pocket, tried to stop a fight and was attacked by a participant who might have been armed with a nunchaku. The defendant had backed up and brandished a gun at the aggressor, but the aggressor continued to approach until the defendant shot him. In Hernandez Ramos, 496 So.2d 837, we reversed a conviction for manslaughter when the defendant testified he was attacked at a bar and tried to leave, but friends of the attacker prevented him from doing so. The defendant testified he shot the victim only after the victim pulled a knife. In that case, no other witnesses saw the altercation or could specifically contradict the defendant's testimony that the victim drew a knife.
Of course, self-defense cases are intensely fact-specific, and each of the seven cases cited above contains individual facts or circumstances that might distinguish it from this case in some particular detail. However, these cases all involve clear aggression by the victim, evidence that the defendant could not retreat, and evidence that the defendant took some effort to ward off the attack or end it without violence. Here, the State's case-in-chief presented a similar scenario with respect to Mr. Jenkins. The State's witnesses uniformly identified the victim as the aggressor who invited the fight and threw the first punch. The witnesses stated that Mr. Jenkins never moved toward the victim and was instead rushed by the victim and did not have time to retreat.
In contrast, cases refusing to acquit defendants based upon claims of self-defense are materially distinguishable from the scenario presented by the State. In some, the defendant seeks out a fight with someone he knows and may have animosity toward. See, e.g., Hunter v. State, 687 So.2d 277 (Fla. 5th DCA 1997) (defendant's brother threatened to kill him during argument; defendant drove away and returned with a rifle); Soberon v. State, 545 So.2d 490 (Fla. 3d DCA 1989) (defendant obtained a gun after altercations with his girlfriend's ex-husband, with which he confronted the ex-husband when the unarmed ex-husband twisted the girlfriend's arm).
In others, the State presented evidence that the defendant had a specific opportunity for escape but instead chose to continue the altercation. See, e.g., Thomas v. State, 918 So.2d 327 (Fla. 1st DCA 2005) (defendant was punched and knocked unconscious; he got back to his feet, retrieved a gun from his friend's car, and returned to shoot the two unarmed men who attacked him); Baker v. State, 506 So.2d 1056 (Fla. 2d DCA 1987) (defendant was approached by three men and attacked while standing next to his car; disputed evidence suggested defendant opened his knife and held it hidden behind him as the three men approached and that nothing prevented the defendant from getting in his car and driving away).
In still others, the fatal blow is made after the danger from an attack has passed. See, e.g., State v. Tai Van Le, 553 So.2d 258 (Fla. 2d DCA 1989) (victim initially confronted defendant with a hammer and broke his windshield; defendant escaped and returned with a gun, which he used when victim threatened and attacked him again); Pressley v. State, 395 So.2d 1175 (Fla. 3d DCA 1981) (defendant *917 sought out altercation and brought gun, then got into a car and drove away exchanging gunfire).
Mr. Jenkins did not know Mr. Cerezo until Mr. Cerezo began pounding on the adjoining trailer. The evidence was undisputed that Mr. Jenkins repeatedly asked Mr. Cerezo to leave. Although Mr. Jenkins came out of the trailer holding a hammer and with a sheathed knife on his belt, the State's witnesses confirmed that these items were customary tools of Mr. Jenkins' trade, not weapons procured specifically to fight Mr. Cerezo. The State argued that Mr. Jenkins' throwing away his hammer in response to Mr. Cerezo's challenge was an act of aggression, but the witnesses agreed that Mr. Jenkins tossed the hammer to the side and did not move toward Mr. Cerezo. Mr. Jenkins testified that as he threw the hammer, he told Mr. Cerezo he did not want to fight. This gesture is equally indicative of a reasonable person assuming that he might defuse the tension by discarding the hammer. Mr. Cerezo landed a solid punch that "wobbled" Mr. Jenkins, backed up, and threatened to kill Mr. Jenkins again. Although Mr. Jenkins unsheathed and held his knife where Mr. Cerezo could see it, Mr. Cerezo drew his arm back and came at Mr. Jenkins for a second time. The State's witness who saw the single stab wound that killed Mr. Cerezo testified that Mr. Jenkins did not swing the knife out at Mr. Cerezo, and the resulting wound was consistent with this testimony.
Mr. Jenkins presented evidence sufficient to establish a prima facie issue of self-defense. It was the State's burden to overcome this defense and prove beyond a reasonable doubt that Mr. Jenkins was not acting in lawful self-defense. Here, the State was unable to present the competent, substantial evidence necessary to overcome Mr. Jenkins' defense and in fact presented evidence consistent with the defense. The trial court should have granted Mr. Jenkins' motion for judgment of acquittal.
Reversed and remanded for discharge.
WHATLEY and KELLY, JJ., concur.
NOTES
[1] Once Mr. Jenkins exited his trailer, it is unclear whether his daughter remained inside the trailer with him or whether she too was outside and witnessed the altercation.
[2] A toxicology report performed on Mr. Cerezo after his death revealed that he was mildly intoxicated. There was, however, no other evidence that might have explained why Mr. Cerezo was acting the way the witnesses described.
[3] The medical examiner testified that the victim was 5 feet 9 inches tall and weighed 157 pounds.
[4] Although described in the testimony as a common "driveway," the aerial photographs of this area reveal a dirt road through and around the trailers in this area, not a road that terminates at one end.
[5] We note that this framework of statutory and case law was materially altered by amendments to chapter 776 that became effective October 1, 2005after the events described here. See ch. 2005-27, §§ 1, 2, Laws of Fla. Section 766.013(3), Florida Statutes (2005), now provides: "A person who is not engaged in an unlawful activity and who is attacked in any other place where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony." Section 766.013(1)(a) also now includes a presumption that a defendant had a reasonable fear of great bodily harm sufficient to justify the use of deadly force if "[t]he person against whom the defensive force was used was in the process of unlawfully and forcefully entering, or had unlawfully and forcibly entered, a dwelling, residence, or occupied vehicle, or if that person had removed or was attempting to remove another against that person's will from the dwelling, residence, or occupied vehicle."
[6] We are inclined to believe that the State's presentation on the location of the fight, whether on or off the Jenkins' property, was probably a distraction that may have confused the jury. The jury may have been left with the impression that it was required to convict Mr. Jenkins if the fight occurred in a common roadway and not on the premises of his modest, mobile "castle." Even in the roadway, however, the jury was instructed that self-defense applied if Mr. Jenkins "reasonably believe[d] that such force [was] necessary to prevent imminent death or great bodily harm to himself or another." See Fla. Std. Jury Instr. (Crim.) 3.6(f). Even if the "castle" doctrine did not specifically apply, the proximity of this altercation to Mr. Jenkins' residence was relevant and telling. The "flight" potentially available to Mr. Jenkins was to retreat into the home despite the "wild man" threatening him outside of it, or to run away from his home, arguably leaving his teenage daughter behind. Whether the "castle doctrine" applied or not, the State failed to present evidence that Mr. Jenkins had a reasonable avenue of retreat; in fact its evidence suggested otherwise.