985 So.2d 550 (2007)
James A. BEHANNA, Appellant,
v.
STATE of Florida, Appellee.
No. 2D06-5766.
District Court of Appeal of Florida, Second District.
December 7, 2007.
Rehearing Denied March 28, 2008.
*551 James E. Felman and Katherine Earle Yanes of Kynes, Markman & Felman, P.A., Tampa, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Timothy A. Freeland, Assistant Attorney General, Tampa, for Appellee.
SILBERMAN, Judge.
James A. Behanna appeals his judgment and sentence for manslaughter with a weapon. Because the trial court erroneously excluded evidence that supported Behanna's defense of self-defense, we reverse and remand for a new trial.

THE TRIAL
Behanna was tried before a jury on the charge of manslaughter with a weapon. Behanna worked as a paralegal at the law office of his wife, Ida Rodriguez. Their home is next door to the law office. The office is across the street from the residence of the alleged victim, twenty-one-year-old Robert Mears. The testimony at trial revealed the following chronology of events.
Teresa Ewing testified that she is the property manager of the building across the street from the law office. On December 7, 2005, she saw Robert Mears come out of his apartment, and he appeared to be very agitated and angry. He had been drinking[1] and had what appeared to be a steak knife in his back pocket and a closed pocketknife or box cutter in his hand. Mears "was waving his arms, talking to himself, yelling, pounding his fist into his hand." Ewing summed up his behavior as very erratic. When Mears started to walk across the street to the law firm, Ewing spoke to him and warned him that the people from the law firm did not want people from Mears' building coming onto the law firm property because they were trying to conduct business there. Ewing told Mears that he needed to cool down and stay away from there, but Mears walked across the street.
Arelis Prita testified that she is a paralegal at the law firm. She was speaking to Behanna's wife, Rodriguez, about work when she saw a man, later identified as Mears, walking across the back. He had "a crazy look" and was disheveled, dirty, "and just had a creepy look to him." Prita could also tell that he had been drinking. Prita yelled to Behanna, who was upstairs, and then she went to the door and told the man that it was private property and that he needed to leave. The man continued coming toward the two women and said that he had a bad day. Prita was scared. Rodriguez also told him to leave, but he continued toward them. She then told Prita to call 911, and Prita did so at 6:16 p.m.
Behanna testified that he saw Mears from the upstairs window. Mears looked "real wild-eyed" and was waving his arms and screaming, "I'm not going to go anywhere." Behanna opened the window and told Mears that he was going to have to leave. Mears responded, "[] you, I'm not going anywhere." Behanna went downstairs, and on his way out he grabbed a small shovel because he is not "a real big guy" and because of the way Mears was acting. When Behanna went outside, he saw Mears approaching his wife and screaming. Behanna again told Mears to leave the property. Mears came towards Behanna and chest-butted him. Behanna *552 smelled a strong odor of alcohol on Mears. Mears grabbed Behanna, pulled him into the air, and threw him to the ground. Two State witnesses who were on the street at the time saw this encounter. One testified that Mears threw Behanna to the ground "like a rag doll" and the other testified that Mears grabbed Behanna and "slammed [him] on the ground."
Behanna testified that Mears landed on top of him and that Mears had the shovel. Mears had one hand on Behanna's chest as Mears brandished the shovel. Behanna managed to grab the leg of Mears' pants and pull Mears off of him. When Behanna got to his feet, Mears was facing Rodriguez with the shovel in his hand. Behanna ran between them and tried to grab the shovel from Mears. Mears threw the shovel in the direction of Rodriguez. Mears then grabbed Behanna and slammed him against a post. Behanna testified that he blacked out for a second and saw stars. When he came to, he saw Mears run off the property and head west on Stanley Street. Behanna screamed for Prita to call 911, and Prita made the second call to 911 at 6:17 p.m. Behanna testified that during this episode in the backyard of the law office he had his knife with him but that he never tried to use it. Prita testified that Behanna always carried a knife at work. His nickname was "McGuyver" because whenever she needed anything opened, he always had a knife on him.
Behanna chased after Mears because he knew Prita had called the police. Behanna wanted Mears there when the police arrived because Mears had beaten him up and may have hit his wife; he wanted Mears arrested. Behanna had five handguns in his home, but he did not stop at his home next door before chasing Mears.
Behanna caught up with Mears, who was resting with his hands on his knees, about halfway down the block. Behanna said, "You need to come back. You've got to wait for the police[.]" Behanna tried to grab Mears' shirt and keep him there. Mears cursed at Behanna and began to walk down Stanley Street. Behanna followed after him and kept telling Mears that he needed to stay there and wait. Mears continued to scream insults at Behanna. Behanna heard some movement, looked back, and saw three men walking at a fast pace about seven or eight yards behind him. Mears looked at Behanna and said, "Those are my boys." Behanna replied, "You still need to stay."
The material factual dispute at trial concerns what happened in the next few moments. Behanna testified that he continued to follow Mears and that when they reached the corner of Stanley and Highland, Mears spun around toward Behanna. Mears grabbed Behanna by the throat and said, "I'm going to []ing kill you." Behanna described how Mears choked him to the point that his vision began to "close in" and that he started to black out. Behanna explained that Mears' hands were crossed as they started to come toward Behanna's throat and that Mears had a hold of his collar and his throat. Behanna felt pressure beside his Adam's apple. Behanna testified that he was unable to push Mears off of him. Behanna feared that he was going to die, so he pulled out his pocketknife and pushed forward with it, but Mears continued. Behanna did not know if he had even hit Mears because Mears was still choking him. Behanna pushed forward with the knife again, and Mears let go of him. Behanna stepped back, feeling a little dizzy, and put his knife away. Although the first thrust with the knife caused only a superficial cut, the second hit Mears' heart, causing his death.
Prita drove to the area when she saw people gathering, and Behanna ran to her *553 car and told her to call EMS. She made the third call to 911 for EMS at 6:20 p.m. Behanna remained at the scene and cooperated with law enforcement. He told an officer that Mears had been choking him and that he had to stab Mears to get him to stop.
The defense presented the testimony of David Bryant, a judo instructor who also teaches police defensive tactics. Bryant testified that the use of a "cross-arm choke" allows great force to be exerted on a person's neck. That choke can be used by exerting pressure on the front of the throat for a "wind choke" that shuts off the air supply. That choke can also be used by exerting pressure on the sides of the neck for a "blood choke" that restricts the flow of blood from the carotid arteries to the brain. However, no evidence was presented that Mears knew how to perform either of these maneuvers.
The defense also presented the testimony of Dr. Libreros as an expert in neurology. Dr. Libreros testified that a photograph taken of Behanna shortly after the incident showed red marks in the area of Behanna's carotid artery. The marks were compatible with choking of the carotid arteries. Dr. Libreros also testified to petechiae, or pinpoint-sized red dots, visible in the photo. He stated that petechiae result from an interruption in the blood supply and are produced by the increase in the pressure of blood flow returning. Dr. Libreros explained that choking of the carotid artery can cause a loss of consciousness in as little as three to five seconds. If the choking is for a prolonged period, a person could die. He further explained that gurgling or gasping as a result of choking is associated with choking of the airway, but that suppressing the blood supply to the brain results in a sensation of passing out.
The State's evidence to disprove Behanna's explanation that he stabbed Mears because Mears was choking him rested on the testimony of two of the three men identified as Mears' "boys"brothers Lavan and Corell Cunningham. Nineteen-year-old Lavan gave a written statement the night of the incident in which he described Mears as grabbing Behanna by the neck. In an interview with a police officer and in a deposition, Lavan described Mears as choking Behanna. At trial, however, he testified that it did not look like Mears was choking Behanna but that Mears "pushed off towards his neck" as a means of keeping away from Behanna. The defense ultimately impeached Lavan's trial testimony. Lavan admitted that he remembered answering in the deposition "yes, yes" to the question of whether Mears choked Behanna with both hands. Defense counsel later asked, "And you remember making that statement to me?" Lavan answered, "Yes." Defense counsel then said, "And that's the truth." Lavan responded, "Yes." The State did not rehabilitate Lavan's testimony on redirect to clarify or challenge Lavan's statement that his deposition was truthful testimony.
Fifteen-year-old Corell Cunningham testified that he followed Mears and Behanna down the street and that he (Corell) was the closest person to them. Corell followed Mears the entire time. Corell testified that he saw Mears "grab[] [Behanna] by the neck and push[] him back[.]" Corell testified that Behanna then pulled out his knife and stabbed Mears. Corell and the prosecutor performed a demonstration of what Mears did to Behanna. The trial transcript contains no description of this demonstration except that afterwards the prosecutor said, "Okay. So it was that fast?" It is unclear from the record whether the demonstration showed Mears grab Behanna by the neck, push him back quickly and let go, or if it showed Mears *554 grab Behanna by the neck and continue to hold on to him while pushing him back. Corell did not see Behanna gasping or choking at any time,[2] and it did not appear to Corell that Behanna was stumbling or disoriented.
On cross-examination, defense counsel did a demonstration and asked if Corell saw "Mr. Behanna being grabbed by the throatone hand on this side of the shirt, one hand on this side of the shirt, and being pushed up like that?" Corell responded, "No." The defense did not impeach Corell on his statement that Mears grabbed Behanna by the neck and pushed him back.
The defense had moved for a judgment of acquittal after the State rested its case and renewed the motion at the conclusion of all the evidence. The defense argued that the State failed to prove beyond a reasonable doubt that Behanna did not act in self-defense. The State argued that two witnesses testified that this was a "push off" and not a choking. The trial court noted that the issue of self-defense is usually a question for the jury and that this was a "classic case" for the jury. The trial court denied the motion, noting that the defense did a good job of impeaching one witness (Lavan Cunningham) but that the other witness (Corell Cunningham) said that he did not see any choking.
The jury found Behanna guilty of culpable negligence manslaughter with a weapon, a first-degree felony. The trial court denied Behanna's motion for new trial. The Criminal Punishment Code scoresheet reflects the lowest permissible prison sentence was 10.38 years and the maximum sentence was thirty years. The trial court sentenced Behanna to fifteen years in prison to be followed by five years of probation.

EVIDENCE EXCLUDED FROM TRIAL
The trial court granted the State's motion in limine to exclude evidence that just minutes before Mears walked across to the law office, he had beaten up his male roommate and a woman at his apartment. The roommate was described as having been "beat up pretty badly" and "pulverized." Defense counsel argued that the assault on the roommate and the assault across the street on Behanna were "all tied together" and that the assault on the roommate was relevant "evidence of the way [Mears] was acting on that day." Although the defense did not seek to introduce the evidence as reputation or character evidence, the trial court excluded the evidence on the basis that it was inadmissible reputation and character evidence because Behanna was not aware of what Mears had done just before Behanna's encounter with him. Behanna made a renewed effort to offer this evidence at the close of all the evidence, but the trial court made the same ruling. Behanna raised the issue again in his motion for new trial, but the trial court denied the motion.

ANALYSIS
On appeal, Behanna raises three issues. He contends that (1) the trial court should have granted his motion for judgment of acquittal because the State failed to rebut his evidence of self-defense; (2) the trial court committed reversible error in excluding evidence that Mears had beaten two other people just before his encounter with Behanna; and (3) the trial court committed *555 reversible error when it gave an incomplete jury instruction on self-defense.
With respect to the denial of Behanna's motion for judgment of acquittal, our standard of review is de novo. See Fowler v. State, 921 So.2d 708, 711 (Fla. 2d DCA 2006). In reviewing the denial of a motion for judgment of acquittal, we "must consider the evidence and all reasonable inferences from the evidence in a light most favorable to the state." Jones v. State, 790 So.2d 1194, 1197 (Fla. 1st DCA 2001) (en banc); see also Pagan v. State, 830 So.2d 792, 803 (Fla.2002). When the defense presents a prima facie case of self-defense, the State has the burden to prove beyond a reasonable doubt that the defendant did not act in self-defense. Fowler, 921 So.2d at 711. "[T]he State must overcome the defense by rebuttal, or by inference in its case-in-chief." Jenkins v. State, 942 So.2d 910, 914 (Fla. 2d DCA 2006), review denied, 950 So.2d 414 (Fla.2007). As the trial court recognized, the issue of whether the defendant acted in justifiable self-defense is generally one for the jury. Fowler, 921 So.2d at 711.
The parties and the court agreed that section 776.013(3), Florida Statutes (2005), applies to this case. Section 776.013(3) provides as follows:
A person who is not engaged in an unlawful activity and who is attacked in any other place [i.e., other than a dwelling, residence, or vehicle] where he or she has a right to be has no duty to retreat and has the right to stand his or her ground and meet force with force, including deadly force if he or she reasonably believes it is necessary to do so to prevent death or great bodily harm to himself or herself or another or to prevent the commission of a forcible felony.
Behanna presented a prima facie case of self-defense that he stabbed Mears only because Mears was choking him; Behanna felt like he was going to black out and was afraid that he would die. Behanna believed that Mears' hands were crossed as he reached for Behanna's throat, and the defense presented evidence, detailed above, regarding a "cross-arm choke" referred to as a "blood choke."
Eyewitness Corell Cunningham testified for the State and stated that he saw Mears grab Behanna by the neck and push Behanna back. Corell performed a demonstration, but, as noted previously, our record does not reflect whether Corell demonstrated that Mears grabbed Behanna by the neck to push him away, thus letting go of Behanna's neck, or whether Corell demonstrated that Mears grabbed Behanna by the neck and continued to hold his neck and push him. The State argued in opposition to the motion for judgment of acquittal as follows:
We had two witnesses who made it clear that this was a push-off, that Mr. Mears grabbed Mr. Behanna and then pushed him away from him after repeatedly telling him to leave him alonesomething to that effect. And it was at that time, and not after any sort of choking or grabbing around the throat or stranglehold or anything like that, that Mr. Behanna then elected to stab Mr. Mears.
Based on the trial testimony, it is obvious that the prosecutor was referring to witnesses Lavan and Corell Cunningham.[3] Although this is a close case, if Corell's demonstration indicated that Mears grabbed Behanna by the neck and just pushed him away as the State's argument seems to indicate, then the trial court properly submitted the case to the jury based on the conflicting testimony.
*556 Because the record before us fails to explain exactly what Corell's demonstration showed, we cannot say that the trial court erred in denying the motion for judgment of acquittal. In reaching this conclusion, we look to case law on missing transcripts in criminal cases as somewhat analogous to the present situation. In Jones v. State, 923 So.2d 486, 488 (Fla. 2006), the supreme court approved the district court's decision that the defendant was not entitled to a new trial when a transcript of the voir dire was unavailable, through no fault of the defendant, and the defendant did not know if any error had occurred. The supreme court clarified that a defendant must "demonstrate that there is a basis for a claim that the missing transcript would reflect matters which prejudice the defendant." Id. at 489. Here, Behanna has not shown that Corell's demonstration would have supported the defense theory. The demonstration, together with Corell's testimony, may well have supported the State's theory that Mears pushed Behanna away and did not choke him. Behanna has not shown that this demonstration contradicted the State's theory. Thus, on this record, we cannot say that the trial court erred in determining that the self-defense issue presented a jury question and in denying Behanna's motion for judgment of acquittal.
Behanna's second issue, however, requires that we reverse for a new trial. Behanna contends that the trial court committed reversible error in excluding evidence that Mears had beaten up two people just before he encountered Behanna. Behanna argues on appeal that Mears' prior violence was relevant to show Mears' actions toward Behanna for the following reasons: (1) the prior beating that Mears administered to his roommate and a woman was part of a continuing episode that culminated a few minutes later with the confrontation between Mears and Behanna; (2) the prior beating showed Mears' motive, intent, and state of mind; and (3) the prior beating was evidence of Mears' physical capabilities.
As to the third reason, Behanna recognizes that the defense did not argue at trial for the admission of the evidence on the ground that the evidence would show Mears' physical capabilities. Mears was 5'10" and weighed about 159 pounds. Behanna is 5'7" and weighs 172 pounds. At the time the parties argued the motion in limine, the defense did not know the State would argue that Mears did not overpower Behanna and would point to the fact that Behanna outweighed Mears by thirteen pounds. Because of the exclusion of evidence, the jury did not hear that Mears severely beat his roommate who was 6'3" and weighed over 200 pounds. Even though the defense did not raise this point in arguing against the motion in limine, the other two grounds that were raised in the trial court support a reversal.
In the trial court, defense counsel argued that the assault on the roommate and the assault across the street on Behanna were "all tied together" and that the assault on the roommate was relevant "evidence of the way [Mears] was acting on that day." The State was able to exploit the exclusion of evidence about the prior beatings in closing argument. For example, the prosecutor characterized Mears as a kid who was "having a bad day" and that he "wasn't out there, trying to cause trouble."
The trial court should have admitted the evidence as inextricably intertwined to show the entire context of events. See Foster v. State, 679 So.2d 747, 753 (Fla.1996) (explaining that collateral-crime evidence may be admitted to establish "the entire context out of which the criminal conduct arose"); Griffin v. State, 639 So.2d 966, 968 (Fla.1994) (explaining *557 that "evidence of uncharged crimes which are inseparable from the crime charged, or evidence which is inextricably intertwined with the crime charged" is admissible as "`a relevant and inseparable part of the act which is in issue'") (quoting Charles W. Ehrhardt, Florida Evidence § 404.17 (1993 ed.)). We recognize that Foster and Griffin deal with the State's presenting collateral crime evidence against the defendant to show the context of the defendant's charged criminal conduct. Similarly, Behanna must also be able to present the entire context of events that led to Mears' allegedly committing a forcible felony against Behanna, thus resulting in Behanna's need to act in self-defense.
For Behanna to have a fair trial on his self-defense claim under the circumstances here, he is entitled to have the jury know that Mears had been engaged in a violent encounter with two people just minutes earlier. Teresa Ewing, the manager of the building where Mears lived, was permitted to testify that Mears was angry and acting erratically, but the jury was not made aware that he was engaging in an ongoing course of violent conduct. Our record reflects that a 911 call was placed at 6:14 p.m. regarding Mears' roommate being beat up[4] and that Arelis Prita made her first 911 call from the law office at 6:16 p.m. Thus, these events occurred just two minutes apart and reflect an ongoing course of violent conduct by Mears. In addition, evidence of Mears' first violent encounter was relevant to show his state of mind and explain his aggression toward Behanna. See Taylor v. State, 855 So.2d 1, 19 (Fla.2003) (recognizing that a victim's state of mind may be relevant when a defendant claims self-defense).
Thus, the trial court abused its discretion in excluding the evidence that Mears had beaten a woman and "pulverized" his roommate just minutes before he encountered Behanna. The State's closing argument exacerbated the error in excluding the evidence. The State's argument led the jury to believe that Mears was just a kid who was "having a bad day" and that he "wasn't out there, trying to cause trouble." The essential factual issue in this case was whether Mears was choking Behanna when Behanna stabbed Mears or whether Mears had pushed Behanna away. The excluded evidence was relevant to the jury's consideration of all of the circumstances and Behanna's self-defense claim. Based on the error in excluding the evidence, we reverse Behanna's judgment and sentence and remand for a new trial.
Our decision renders moot issue three regarding the self-defense jury instruction. We note for purposes of remand that it appears the trial court inadvertently omitted the definition of felony battery when giving the self-defense instruction. The parties and the trial court had agreed to give Florida Standard Jury Instruction (Criminal) 3.6(f), Justifiable Use of Deadly Force. The defense had requested and the trial court had agreed to include the definition of felony battery as the applicable felony that Behanna alleged Mears was attempting to commit. If the case goes to the jury on remand, the trial court shall include the definition of the applicable felony when giving the self-defense instruction.
Reversed and remanded for new trial.
DAVIS and CANADY, JJ., Concur.
NOTES
[1] A forensic toxicologist testified that Mears had a .11 blood alcohol level at the time of his death.
[2] However, as explained by Dr. Libreros, placing pressure on the airway results in gasping or choking; visible gasping would not necessarily result from placing pressure on the carotid artery.
[3] As discussed above, Lavan's testimony was impeached.
[4] In the transcript of the 911 call regarding the roommate, the caller stated that Mears "done beat the dude damn near to death."