VILLANTI, Judge.
James Nicholas appeals his convictions for trafficking in cocaine (200 grams to 400 grams) and conspiracy to traffic in cocaine (200 grams to 400 grams), alleging numer *299 ous errors. We affirm on all grounds except one, which requires reversal of the trafficking conviction because the State failed to produce sufficient evidence of constructive possession of cocaine. We also write to explain why we reject Nicholas’ argument regarding the removal of a juror during trial.
The charges against Nicholas stemmed from an undercover investigation of suspected large-scale drug trafficking. Law enforcement began investigating after receiving information suggesting that more than a dozen individuals were involved in a single operation manufacturing and selling drugs. During the course of the investigation, law enforcement received information from a confidential informant that he had seen Nicholas cooking cocaine and giving that cocaine to Sidney Deloch, Tamiko James, Chuckie James, and Lonnie Tingle in exchange for $7000. Nicholas was subsequently charged with trafficking in cocaine based on his alleged possession of large quantities of cocaine.[1] See § 893.135(l)(b), Fla. Stat. (2005) (defining the offense of trafficking to include “actual or constructive possession” of 28 grams or more of cocaine).
At trial, the State presented evidence that drug trafficking activities were taking place in several apartments. One of the apartments was known as “Cerro Circle,” and the State introduced evidence that this apartment was controlled by Nicholas and Chuckie James. Another apartment known as “Morro Manor” was controlled by Sidney Deloch and Darían James. Nicholas’ name was not on the Morro Manor lease. Law enforcement obtained search warrants for the apartments and discovered large quantities of cocaine in the Morro Manor apartment. Nicholas was not present at the Morro Manor apartment when the cocaine was found nor were his fingerprints found on any of the Morro Manor cocaine bags or on any other evidence found by law enforcement during its search.
At the Cerro Circle apartment police found scales, baking soda, zip lock bags, a razor blade, and cooking pots, all of which are items commonly used to manufacture and sell crack cocaine. However, law enforcement did not find any cocaine in the Cerro Circle apartment. No undercover agent had a “hands to hands” drug transaction with Nicholas, and no cocaine was found on Nicholas’ person. Although law enforcement recorded numerous telephone conversations during the investigation, none of those conversations directly implicated Nicholas in the actions supporting the trafficking charge against him.
The State also presented the testimony of Deloch, who was Nicholas’ cousin. De-loch testified that he knew Nicholas was a drug distributor because the two talked about prices; he told Nicholas that he had paid $24,000 for a kilo of cocaine and Nicholas told Deloch that he had paid $23,000 for the same amount. Deloch also testified that he received nine ounces of cocaine from Nicholas during the period covered by the investigation. Deloch testified that he negotiated with Nicholas over the telephone for that cocaine, he later received the negotiated amount of cocaine from Chuckie James at the Cerro Circle apartment, and Chuckie James told him that Nicholas had left the cocaine for him. However, that cocaine was not introduced at trial.
Tamiko James, Nicholas’ brother, testified that he — Tamiko—was selling crack *300 cocaine from August to November 2005. During that time frame, he obtained cocaine from Nicholas ten to twenty times. The smallest amount Tamiko James obtained from Nicholas during that period was fourteen grams and the largest amount was three or four ounces. He would sell the cocaine on consignment and pay Nicholas when it sold. He testified that Nicholas had a key to both the Morro Manor and the Cerro Circle apartments and that Nicholas had opened the doors to both apartments for him. He also testified that during the period of law enforcement’s investigation he saw Nicholas numerous times cooking crack cocaine at the Cerro Circle apartment. The most cocaine he ever saw Nicholas cooking was “a hundred and something” grams. He also testified that Nicholas did “all the cooking” of cocaine for the drug operation.
Police detectives testified at trial that Nicholas admitted post-Miranda[2] that he was cooking and selling cocaine. He disclosed the identity of his cocaine source and indicated that he was getting between one and three kilos of cocaine at least twice a month. He admitted that a substantial amount of money found by law enforcement in two safes belonged to him and was derived from the sale of drugs.
At the close of the State’s case, Nicholas moved for judgment of acquittal, contending that the State had not established that he ever possessed an amount of cocaine sufficient to support the trafficking charge. The State argued that while the evidence was circumstantial, it was nevertheless sufficient to tie Nicholas to the Morro Manor cocaine. The trial court denied Nicholas’ motion, and the jury ultimately found Nicholas guilty of this offense. Nicholas now appeals the denial of his motion for judgment of acquittal on this charge.
A motion for judgment of acquittal challenges the legal sufficiency of the evidence. State v. Odom, 862 So.2d 56, 59 (Fla. 2d DCA 2003). The trial court should grant a judgment of acquittal if the State fails to present legally sufficient evidence to establish each element of the crime charged. Id. The appellate court reviews de novo a trial court’s denial of a motion for judgment of acquittal, considering the evidence and all reasonable inferences from the evidence in the light most favorable to the State. Behanna v. State, 985 So.2d 550, 555 (Fla. 2d DCA 2007), review denied, 988 So.2d 622 (Fla.2008).
Because Nicholas was not found in actual possession of cocaine, the State’s trafficking charge against him was premised upon his constructive possession of the cocaine found in the Morro Manor apaHment. To prove constructive possession, the State must show beyond a reasonable doubt that the defendant (1) knew of the presence of the contraband and (2) had the ability to exercise dominion and control over it. Santiago v. State, 991 So.2d 439, 441 (Fla. 2d DCA 2008); C.M. v. State, 818 So.2d 554, 555 (Fla. 2d DCA 2002). Furthermore, where contraband is found in a location accessible to more than one person, the defendant’s knowledge of the presence of the contraband on the premises and his ability to exercise dominion and control over it will not be inferred and must be established by independent proof. Wagner v. State, 950 So.2d 511, 513 (Fla. 2d DCA 2007). Such independent proof “may consist of evidence that the defendant had actual knowledge of the presence of the contraband or evidence of incriminating statements or circumstances, other than simple proximity to the contraband, from which the jury could infer the defendant’s knowledge.” Id. (citing Woods *301 v. State, 765 So.2d 255, 257 (Fla. 2d DCA 2000)); see also Jackson v. State, 995 So.2d 535, 540-41 (Fla. 2d DCA 2008) (holding that evidence of knowledge, dominion, and control was sufficient to deny motion for judgment of acquittal where drugs found during a search were located in or about other personal possessions owned or controlled by the defendant).
In this case, the State presented no independent proof that Nicholas knew of the presence of the cocaine found in the Morro Manor apartment. Nicholas was not present at the apartment when the cocaine was found, the Morro Manor apartment was not leased to him, he made no incriminating statements linking him to the cocaine found at the Morro Manor apartment, and his fingerprints were not on that cocaine or on any other evidence found there. Further, Nicholas’ post-Miranda statements that he cooked and sold an unknown quantity of cocaine at an unknown time and that he had sold large quantities of drugs in the past were not sufficient to establish his actual or constructive possession of the Morro Manor cocaine. As a result, none of the evidence presented by the State established that Nicholas exercised dominion and control over any of the cocaine found in the Morro Manor apartment. Without dominion and control, a conviction for trafficking cannot be sustained. See, e.g., Gibson v. State, 940 So.2d 1263, 1265 (Fla. 1st DCA 2006) (reversing conviction for trafficking in cocaine where there was no evidence that the defendant had dominion or control over the cocaine).[3] Therefore, based on these facts, we must reverse Nicholas’ conviction and sentence for trafficking in cocaine, and we remand for Nicholas to be resentenced on the conspiracy conviction, using a corrected scoresheet.
While this resolution disposes of Nicholas’ claims concerning his trafficking conviction, Nicholas also makes several arguments as to why his conspiracy conviction should be reversed. While we reject all of these arguments, we write to explain why the trial court did not commit reversible error by removing a juror during trial.
During jury selection, the trial court read to the potential jurors the names of all the individuals charged in the case, including Tamiko James’ and Nicholas’ names. The court asked the entire jury pool if any of them were related by blood or marriage to Nicholas or to any of the attorneys in the case; none of the jurors made any affirmative disclosures in response to that inquiry. Although the prospective jurors were not individually asked if they knew Tamiko James or Nicholas, the trial court gave the following, open-ended, general directive to all prospective jurors:
If you’re sitting there and you have something you want to say, raise your hand and let us know. If you’re sitting there and you are just thinking and waiting saying, you know, I’m waiting for them to ask me this question. I think they need to know this about me, and nobody asks it, let us know. If there’s something you think that we need to know about your background or your life experience, let us know so that we can ask that question.
(Emphasis added.) None of the jurors responded to the court’s inquiry.
During Tamiko James’ testimony[4] against Nicholas, he recognized a particu *302 lar juror as someone who had attended high school with him and Nicholas. He notified the court that both he and Nicholas knew this juror. Tamiko James told the court that the juror had been to his house, he considered the juror his friend and Nicholas’ friend, and in the 1990s he had sold marijuana and cocaine to the juror and had smoked marijuana with him. The State notified the court and the defense that during Tamiko James’ direct examination the juror had been observed making “extreme eye contact” with Nicholas’ family but looked away every time the State looked at him. As a result of these revelations, the trial court, in the presence of the State and defense, conducted a colloquy with the juror. The juror admitted without hesitation that he knew Tamiko James and Nicholas and that he was familiar with other members of their family, but claimed he had not seen Tamiko James in seven or eight years. The trial court asked him: “Do you still feel that you can be fair and impartial in this case knowing the fact that you know one of the State’s key witnesses in this case, Tamiko James, and also that you may know Mr. Nicholas?” The juror responded: “Well, I took that into consideration when you initially asked the question so, yeah.” (Emphasis added.) The juror denied ever buying drugs or doing drugs.
The juror admitted that he had recognized Tamiko James’ and Nicholas’ names immediately when the information was read. When asked why he had not revealed that he knew Nicholas and Tami-ko James, the juror justified his silence by explaining that while he recognized Nicholas’ and Tamiko James’ names from the information, he had only been asked whether he “was in their family.” The trial court noted that the jurors had been asked whether they were related by blood or marriage. The juror subsequently commented that having him as a juror in the case “would just indicate it is a jury of peers,” a comment which the trial court noted during its discussions with counsel the next day. The State moved to remove the juror, asserting that it would have exercised a peremptory challenge had it known this information during jury selection. Despite the fact that the colloquy shows that the juror failed to abide by the trial court’s directive during voir dire, Nicholas objected to removal of the juror, arguing that there was no juror misconduct because the State had not asked a question to elicit information about the juror’s acquaintance with the defendant. Nicholas also argued that the juror had stated that he could be fair and impartial. Because, like Nicholas, the juror was African-American, Nicholas argued that the juror would be able to understand the jargon of the recorded conversations played for the jury. The trial court removed the juror from the case after concluding that he had concealed information which, if disclosed, would have been material to whether the juror would have been challenged. The court noted that another African-American juror remained in the jury, even though the juror’s race would be irrelevant if misconduct was established. A previously selected alternate juror was ultimately substituted.[5] Under these circumstances, we find no abuse of discretion in the trial court’s decision to remove the juror.
We begin our analysis with some general principles. Florida Rule of Criminal Procedure 3.280(a) provides for the selection of alternate jurors to replace ju *303 rors who become unable or disqualified to perform their duties prior to the time the jury retires to deliberate. As a general rule, “[t]he conduct of jurors is the responsibility of the court and the court is allowed discretion in dealing with any problems that arise.” Orosz v. State, 389 So.2d 1199, 1200 (Fla. 1st DCA 1980); see generally Jennings v. State, 512 So.2d 169, 173 (Fla.1987) (“The trial judge has broad discretion in deciding whether a juror may sit.”); State v. Williams, 465 So.2d 1229, 1231 (Fla.1985) (“The trial judge hears and sees the prospective juror and has the unique ability to make an assessment of the individual’s candor and the probable certainty of his answers to critical questions presented to him. This is why a trial court has broad discretion regarding juror bias[.]”); Wiley v. State, 427 So.2d 283, 286 (Fla. 1st DCA 1983) (“The trial court has broad discretion in removing a juror[.]”).
“ ‘A juror who falsely misrepresents his interest or situation, or conceals a material fact relevant to the controversy, is guilty of misconduct[.]’ ” De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995) (quoting Loftin v. Wilson, 67 So.2d 185 (Fla.1953)); see also James v. State, 843 So.2d 933, 936 (Fla. 4th DCA 2003) (“Generally, juror misconduct issues arise where a juror conceals a material fact during voir dire.”). Thus, a juror’s concealment of material information during voir dire provides good cause for removal of that juror mid-trial and substitution with an alternate juror. See, e.g., Wilson v. State, 608 So.2d 842, 843 (Fla. 3d DCA 1992) (finding dismissal of juror and replacement with alternate mid-trial proper); see also State v. McGough, 536 So.2d 1187, 1189 (Fla. 2d DCA 1989) (“In addition to an untruthful response on voir dire, a juror’s concealment of information which may have been material to whether that juror would be excused by peremptory challenge or for cause, when such concealment is not revealed or discovered until after trial, can in certain circumstances justify the granting of a new trial.”); State v. Tresvant, 359 So.2d 524, 526 (Fla. 3d DCA 1978) (stating that juror’s concealment of material information which is not revealed until after trial may be grounds for a new trial). A fact is considered material “if it exposes an inherent bias in favor of or against either party.” James, 843 So.2d at 936.
There is no published opinion with facts so analogous to the facts of this case as to easily dispose of the issue on appeal here. However, in Wilson the State had asked the entire venire whether they could be impartial. 608 So.2d at 843. A particular juror did not respond to that question, nor did she ask for a side-bar. Id. During trial, the court was made aware of a potential problem with that juror. Id. When the court questioned the juror, she stated that “the State Attorney’s Office was trying to do something to her mother that was unfair[,]” but that she could still be fair and impartial as a juror in the case. Id. The trial court removed the juror and replaced her with an alternate. Id. The defendant argued the trial court had erred in dismissing the juror after the start of testimony. The Third District concluded that the trial court had “properly resolved the problem.” Id.
In Lebron v. State, 724 So.2d 1208, 1209 (Fla. 5th DCA 1998), the trial court during voir dire asked the jury panel generally whether they knew anything about the case and specifically whether they knew the defendant. A particular juror did not answer either question in the affirmative. Id. No one specifically asked the prospective jurors if they knew the victim. The trial court then directed the panel, “if at any time something jogs your memory that you recall, something about this case, please raise your hand and interrupt at *304 any time and let us know so we can talk with you.” Id. It was later discovered that the juror at issue had not disclosed that the victim was his friend. Id. When questioned, the juror claimed he did not realize until the night before deliberations began that the defendant might be the one who shot his friend. Id. at 1210. When asked why he had not disclosed the information, the juror responded: “I didn’t lie to you. I didn’t know anything about him or the case. I said I thought, you see what I am saying? I didn’t — I don’t know for sure.” Id. at 1209. The appellate court concluded that the juror’s failure to disclose his knowledge constituted prejudicial juror misconduct. Id. The juror had “the continuing duty throughout the trial to advise the court if he recalled anything about the case.” Id. at 1210. Had the juror disclosed the information before the jury began deliberations, an alternate juror could have taken his place, preserving the integrity of the process. Id.
Consistent with these principles, it is appropriate to remove a juror who has been less than candid during voir dire. See, e.g., Wilson, 608 So.2d at 843; Tresvant, 359 So.2d at 524 (finding that trial court did not abuse its discretion in removing juror who made only partial disclosure about her arrest record during voir dire because that information was material); Minnis v. Jackson, 330 So.2d 847, 848 (Fla. 3d DCA 1976) (“The well established rule is that the failure of a juror to honestly answer material questions propounded to him on voir dire constitutes bad faith requiring his disqualification from serving on the jury in the case.”).
Here, the fact that the juror in question knew both Nicholas and a key witness— and that he might have purchased drugs from Tamiko James and/or might have smoked marijuana with him — was relevant and material because it could have exposed an inherent bias or sympathy in favor of Nicholas. The juror’s vehement denial of the drug-related allegations only complicated the analysis, especially when coupled with the juror’s selective reasoning for not disclosing his prior acquaintance with Nicholas and Tamiko James, and his comment that he was a “peer” of Nicholas. It does not take a “mentalist” to discern from the juror’s responses to the trial court’s colloquy that he had immediately recognized Nicholas’ and Tamiko’s names from the information, that he listened to the voir dire questions waiting to be asked a question other than whether he was related to Nicholas “by blood or marriage,” and that he had considered whether to disclose his knowledge of Nicholas and Tamiko James, but decided on his own that he did not need to disclose that knowledge, thereby ignoring the court’s directives. The juror’s failure to be completely candid during jury selection in this case precluded the State from inquiring into his rationalization. See generally Story v. State, 53 So.2d 920, 922 (Fla.1951) (affirming denial of new trial where juror gave an incomplete answer during von- dire because, in that case, the juror’s answer did not conceal legal grounds for disqualification, but noting that “ ‘[a] juror does not possess the right to pass upon the question of what is or what is not deemed material by the court, or the litigants, touching his qualifications to serve in a particular case.’ ”) (quoting United States v. Lampkin, 66 F.Supp. 821, 824 (S.D.Fla.1946)). Additionally, the State did not have to accept at face value the juror’s assertion that he could be fair and impartial. The end result was that the State was impaired in its ability to intelligently decide whether the juror should be challenged during voir *305 dire.[6] We also note that the State alleged that the juror was acting in a peculiar manner, making “extreme” eye contact with Nicholas’ family.
While there may be room for reasonable people to disagree about the juror’s good faith intent and his claimed ability to be fair and impartial, these are not relevant considerations when a juror has concealed materially relevant information during voir dire. If a juror conceals relevant and material information, his subsequent claim that he can be fair and impartial is of no moment. See generally Wilson, 608 So.2d at 843 (affirming dismissal of juror who did not disclose during voir dire that “the State Attorney’s Office was trying to do something to her mother that was unfair” and then, when questioned mid-trial about that, claimed that she could still be fair and impartial).
Voir dire is intended to obtain an impartial jury, and “impartiality requires not only freedom from jury bias against the accused and for the prosecution but also freedom from jury bias against the prosecution and for the accused.” Moody v. State, 418 So.2d 989, 993 (Fla.1982). “ ‘It is the duty of a trial court to see that defendants in criminal eases are tried by a jury such that not even the suspicion of bias (leaning) or prejudice (prejudgment) can attach to any member thereof.’ ” Elliott v. State, 77 Fla. 611, 82 So. 139, 142 (1919) (emphasis added) (quoting Jacobs v. State, 1 Ga.App. 519, 57 S.E. 1063 (1907)). Thus, if there is any reasonable doubt as to whether a particular juror can render an impartial verdict based solely on the evidence presented and the law announced at trial, that juror should be removed, even if the juror affirmatively states that he can be impartial. See Graham v. State, 470 So.2d 97, 97-98 (Fla. 1st DCA 1985) (citing Singer v. State, 109 So.2d 7 (Fla.1959)). The trial court had the best overall vantage point to determine if the juror held a bias in favor of, or against, one of the parties. See Williams, 465 So.2d at 1231; see generally Sims v. State Farm Mut. Auto. Ins. Co., 748 So.2d 383, 384 (Fla. 3d DCA 2000) (“The trial court was in the best position to determine the credibility of the jurors’ responses and we decline to disturb the court’s ruling.”).
The trial court in this case was placed in a predicament.[7] Tamiko James was Nicholas’ brother, and was testifying that he had sold on consignment cocaine which he obtained from Nicholas. Aware of Tamiko James’ allegations that the juror had smoked marijuana with him, had purchased marijuana and cocaine from him, and had been to his house at least once in the past, if the court did not remove the juror, there would be a lingering question as to whether the juror’s prior knowledge and interaction with Tamiko and Nicholas influenced the verdict. This concern would exist regardless of whether Nicholas was convicted or acquitted — i.e., if Tamiko James’ allegations were in fact true, was the jury’s decision to acquit or to find Nicholas guilty influenced in any way by this particular juror’s external knowledge of Tamiko James’ prior drug use or sales? On these facts, there was doubt as to whether the juror could render an impartial verdict and the trial court was justified *306 in removing the juror,[8] thereby dispelling any suspicion of bias or prejudice.[9] To address a concern expressed by the dissent, nothing in this case suggests that the trial court removed the juror to “place a judicial thumb on the scales of justice by altering the jury’s composition” after it began hearing the evidence, or to change the outcome of the case.
The primary differences between the dissent and our holding relates to whether the State exercised due diligence in questioning the venire, and whether the trial court was constrained by rule or case law from exercising its discretion to find juror misconduct under the facts of this case. We do not disagree with the dissent’s opinion that the prosecutor should ask the questions it deems important to enable it to select impartial jurors. However, we disagree with the dissent’s implication that a party cannot, as happened here, rely on jurors’ answers to the trial court’s questions that garner the same information as if that party had asked the pertinent questions. This is a common procedure used in jury selection. In our view, for purposes of due diligence, it does not matter who poses the questions; the issue is whether the question should have elicited the information at issue and whether the juror’s answers to voir dire reveal concealment.[10] Although it might have been easier for us to review the trial court’s discretionary decision on the issue of juror concealment if the question of familiarity with Nicholas or Tamiko James had been specifically asked of the jurors, we cannot say the trial court abused its discretion in finding concealment in this case. In matters of interpretation, appellate courts are required to defer to a trial court’s reasonable assessment and handling of problems that arise during trial. The dissent emphasizes that the juror did not reveal his prior acquaintance with Tamiko James or Nicholas because he had only been asked if he was related to Nicholas by blood or marriage. This overlooks the fact that the juror recognized Nicholas’ and Tamiko James’ names from the information but ignored the trial court’s general query during voir dire, deciding instead that he did not need to disclose that he knew Nicholas and Tamiko James.
The dissent also relies on the temporal remoteness of the juror’s connection with Nicholas and Tamiko James, based upon extrapolation of assumptions related to age. Although we do not believe it appropriate to engage in such speculation, had the trial court declined to remove the juror on such basis, we would have also been compelled to affirm because the trial court’s discretion would have been exercised consistent with its reasonable analysis. See, e.g., Bigham v. State, 995 So.2d 207, 215 (Fla.2008) (finding no error in the trial court’s decision to allow a juror to *307 remain in the jury panel and finding no concealment of material information where juror voluntarily came forward as soon as he recognized a testifying witness as an acquaintance and the juror’s past conversations with the witness had been brief, distant, and had no relation to the witness’s job as a detective).
Finally, we do not engage in harmless error analysis in this opinion because given our conclusion that there was no error, any harmless error discussion would be dicta.
Affirmed in part; reversed in part; remanded with directions.
CRENSHAW, J., Concurs.
WALLACE, J., Concurring in part and dissenting in part with opinion.

. Fifteen other defendants were also charged with various offenses arising out of the same investigation.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. Notably, the State did not cite a single case supporting its argument that the evidence was legally sufficient to send the case to the jury on the issue of Nicholas' constructive possession of the cocaine found in the Morro Manor apartment.

. Tamiko James pleaded guilty to the charges against him before trial.

. The defense did not seek to exercise a peremptory challenge to sit a different alternate juror. The record does not reflect the race or gender of the remaining jury pool.

. Having concluded that the juror was appropriately removed for misconduct, any argument that removal of the juror had the result of erroneously reconfiguring the jury is inapplicable.

. In fact, Nicholas' counsel conceded that there was no published opinion exactly on point on the issue presented to the trial court.

. We note that the trial court did not actually remove the juror immediately upon making its ruling, but let him remain on the panel until the jury was sent to deliberate. The trial court dismissed the juror with its thanks for serving as an "alternate.” Neither side objected to this methodology. While we do not endorse this approach, we do not find fault in it.

. This opinion should not be read as excusing a party’s failure to ask relevant questions of prospective jurors, especially questions as basic as whether the prospective jurors are acquainted with the defendant or the witnesses in the case. We simply hold that, given the facts of this case, the overarching tenor of jury selection was such that a reasonable juror would have known that he had a duty to disclose his knowledge of this defendant and codefendant.

.This is particularly true in instances where trial judges do not allow redundant questions; nor should parties be required to prolong jury selection, at die risk of boring the panel, in order to establish "due diligence.”