47 So.3d 297 (2010)
James NICHOLAS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D07-5400.
District Court of Appeal of Florida, Second District.
July 28, 2010.
Rehearing Denied October 18, 2010.
*298 Bryant R. Camareno, Tampa, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Richard M. Fishkin, Assistant Attorney General, Tampa, for Appellee.
VILLANTI, Judge.
James Nicholas appeals his convictions for trafficking in cocaine (200 grams to 400 grams) and conspiracy to traffic in cocaine (200 grams to 400 grams), alleging numerous *299 errors. We affirm on all grounds except one, which requires reversal of the trafficking conviction because the State failed to produce sufficient evidence of constructive possession of cocaine. We also write to explain why we reject Nicholas' argument regarding the removal of a juror during trial.
The charges against Nicholas stemmed from an undercover investigation of suspected large-scale drug trafficking. Law enforcement began investigating after receiving information suggesting that more than a dozen individuals were involved in a single operation manufacturing and selling drugs. During the course of the investigation, law enforcement received information from a confidential informant that he had seen Nicholas cooking cocaine and giving that cocaine to Sidney Deloch, Tamiko James, Chuckie James, and Lonnie Tingle in exchange for $7000. Nicholas was subsequently charged with trafficking in cocaine based on his alleged possession of large quantities of cocaine.[1]See § 893.135(1)(b), Fla. Stat. (2005) (defining the offense of trafficking to include "actual or constructive possession" of 28 grams or more of cocaine).
At trial, the State presented evidence that drug trafficking activities were taking place in several apartments. One of the apartments was known as "Cerro Circle," and the State introduced evidence that this apartment was controlled by Nicholas and Chuckie James. Another apartment known as "Morro Manor" was controlled by Sidney Deloch and Darian James. Nicholas' name was not on the Morro Manor lease. Law enforcement obtained search warrants for the apartments and discovered large quantities of cocaine in the Morro Manor apartment. Nicholas was not present at the Morro Manor apartment when the cocaine was found nor were his fingerprints found on any of the Morro Manor cocaine bags or on any other evidence found by law enforcement during its search.
At the Cerro Circle apartment police found scales, baking soda, zip lock bags, a razor blade, and cooking pots, all of which are items commonly used to manufacture and sell crack cocaine. However, law enforcement did not find any cocaine in the Cerro Circle apartment. No undercover agent had a "hands to hands" drug transaction with Nicholas, and no cocaine was found on Nicholas' person. Although law enforcement recorded numerous telephone conversations during the investigation, none of those conversations directly implicated Nicholas in the actions supporting the trafficking charge against him.
The State also presented the testimony of Deloch, who was Nicholas' cousin. Deloch testified that he knew Nicholas was a drug distributor because the two talked about prices; he told Nicholas that he had paid $24,000 for a kilo of cocaine and Nicholas told Deloch that he had paid $23,000 for the same amount. Deloch also testified that he received nine ounces of cocaine from Nicholas during the period covered by the investigation. Deloch testified that he negotiated with Nicholas over the telephone for that cocaine, he later received the negotiated amount of cocaine from Chuckie James at the Cerro Circle apartment, and Chuckie James told him that Nicholas had left the cocaine for him. However, that cocaine was not introduced at trial.
Tamiko James, Nicholas' brother, testified that heTamikowas selling crack *300 cocaine from August to November 2005. During that time frame, he obtained cocaine from Nicholas ten to twenty times. The smallest amount Tamiko James obtained from Nicholas during that period was fourteen grams and the largest amount was three or four ounces. He would sell the cocaine on consignment and pay Nicholas when it sold. He testified that Nicholas had a key to both the Morro Manor and the Cerro Circle apartments and that Nicholas had opened the doors to both apartments for him. He also testified that during the period of law enforcement's investigation he saw Nicholas numerous times cooking crack cocaine at the Cerro Circle apartment. The most cocaine he ever saw Nicholas cooking was "a hundred and something" grams. He also testified that Nicholas did "all the cooking" of cocaine for the drug operation.
Police detectives testified at trial that Nicholas admitted post-Miranda[2] that he was cooking and selling cocaine. He disclosed the identity of his cocaine source and indicated that he was getting between one and three kilos of cocaine at least twice a month. He admitted that a substantial amount of money found by law enforcement in two safes belonged to him and was derived from the sale of drugs.
At the close of the State's case, Nicholas moved for judgment of acquittal, contending that the State had not established that he ever possessed an amount of cocaine sufficient to support the trafficking charge. The State argued that while the evidence was circumstantial, it was nevertheless sufficient to tie Nicholas to the Morro Manor cocaine. The trial court denied Nicholas' motion, and the jury ultimately found Nicholas guilty of this offense. Nicholas now appeals the denial of his motion for judgment of acquittal on this charge.
A motion for judgment of acquittal challenges the legal sufficiency of the evidence. State v. Odom, 862 So.2d 56, 59 (Fla. 2d DCA 2003). The trial court should grant a judgment of acquittal if the State fails to present legally sufficient evidence to establish each element of the crime charged. Id. The appellate court reviews de novo a trial court's denial of a motion for judgment of acquittal, considering the evidence and all reasonable inferences from the evidence in the light most favorable to the State. Behanna v. State, 985 So.2d 550, 555 (Fla. 2d DCA 2007), review denied, 988 So.2d 622 (Fla.2008).
Because Nicholas was not found in actual possession of cocaine, the State's trafficking charge against him was premised upon his constructive possession of the cocaine found in the Morro Manor apartment. To prove constructive possession, the State must show beyond a reasonable doubt that the defendant (1) knew of the presence of the contraband and (2) had the ability to exercise dominion and control over it. Santiago v. State, 991 So.2d 439, 441 (Fla. 2d DCA 2008); C.M. v. State, 818 So.2d 554, 555 (Fla. 2d DCA 2002). Furthermore, where contraband is found in a location accessible to more than one person, the defendant's knowledge of the presence of the contraband on the premises and his ability to exercise dominion and control over it will not be inferred and must be established by independent proof. Wagner v. State, 950 So.2d 511, 513 (Fla. 2d DCA 2007). Such independent proof "may consist of evidence that the defendant had actual knowledge of the presence of the contraband or evidence of incriminating statements or circumstances, other than simple proximity to the contraband, from which the jury could infer the defendant's knowledge." Id. (citing Woods *301 v. State, 765 So.2d 255, 257 (Fla. 2d DCA 2000)); see also Jackson v. State, 995 So.2d 535, 540-41 (Fla. 2d DCA 2008) (holding that evidence of knowledge, dominion, and control was sufficient to deny motion for judgment of acquittal where drugs found during a search were located in or about other personal possessions owned or controlled by the defendant).
In this case, the State presented no independent proof that Nicholas knew of the presence of the cocaine found in the Morro Manor apartment. Nicholas was not present at the apartment when the cocaine was found, the Morro Manor apartment was not leased to him, he made no incriminating statements linking him to the cocaine found at the Morro Manor apartment, and his fingerprints were not on that cocaine or on any other evidence found there. Further, Nicholas' post-Miranda statements that he cooked and sold an unknown quantity of cocaine at an unknown time and that he had sold large quantities of drugs in the past were not sufficient to establish his actual or constructive possession of the Morro Manor cocaine. As a result, none of the evidence presented by the State established that Nicholas exercised dominion and control over any of the cocaine found in the Morro Manor apartment. Without dominion and control, a conviction for trafficking cannot be sustained. See, e.g., Gibson v. State, 940 So.2d 1263, 1265 (Fla. 1st DCA 2006) (reversing conviction for trafficking in cocaine where there was no evidence that the defendant had dominion or control over the cocaine).[3] Therefore, based on these facts, we must reverse Nicholas' conviction and sentence for trafficking in cocaine, and we remand for Nicholas to be resentenced on the conspiracy conviction, using a corrected scoresheet.
While this resolution disposes of Nicholas' claims concerning his trafficking conviction, Nicholas also makes several arguments as to why his conspiracy conviction should be reversed. While we reject all of these arguments, we write to explain why the trial court did not commit reversible error by removing a juror during trial.
During jury selection, the trial court read to the potential jurors the names of all the individuals charged in the case, including Tamiko James' and Nicholas' names. The court asked the entire jury pool if any of them were related by blood or marriage to Nicholas or to any of the attorneys in the case; none of the jurors made any affirmative disclosures in response to that inquiry. Although the prospective jurors were not individually asked if they knew Tamiko James or Nicholas, the trial court gave the following, open-ended, general directive to all prospective jurors:
If you're sitting there and you have something you want to say, raise your hand and let us know. If you're sitting there and you are just thinking and waiting saying, you know, I'm waiting for them to ask me this question. I think they need to know this about me, and nobody asks it, let us know. If there's something you think that we need to know about your background or your life experience, let us know so that we can ask that question.

(Emphasis added.) None of the jurors responded to the court's inquiry.
During Tamiko James' testimony[4] against Nicholas, he recognized a particular *302 juror as someone who had attended high school with him and Nicholas. He notified the court that both he and Nicholas knew this juror. Tamiko James told the court that the juror had been to his house, he considered the juror his friend and Nicholas' friend, and in the 1990s he had sold marijuana and cocaine to the juror and had smoked marijuana with him. The State notified the court and the defense that during Tamiko James' direct examination the juror had been observed making "extreme eye contact" with Nicholas' family but looked away every time the State looked at him. As a result of these revelations, the trial court, in the presence of the State and defense, conducted a colloquy with the juror. The juror admitted without hesitation that he knew Tamiko James and Nicholas and that he was familiar with other members of their family, but claimed he had not seen Tamiko James in seven or eight years. The trial court asked him: "Do you still feel that you can be fair and impartial in this case knowing the fact that you know one of the State's key witnesses in this case, Tamiko James, and also that you may know Mr. Nicholas?" The juror responded: "Well, I took that into consideration when you initially asked the question so, yeah." (Emphasis added.) The juror denied ever buying drugs or doing drugs.
The juror admitted that he had recognized Tamiko James' and Nicholas' names immediately when the information was read. When asked why he had not revealed that he knew Nicholas and Tamiko James, the juror justified his silence by explaining that while he recognized Nicholas' and Tamiko James' names from the information, he had only been asked whether he "was in their family." The trial court noted that the jurors had been asked whether they were related by blood or marriage. The juror subsequently commented that having him as a juror in the case "would just indicate it is a jury of peers," a comment which the trial court noted during its discussions with counsel the next day. The State moved to remove the juror, asserting that it would have exercised a peremptory challenge had it known this information during jury selection. Despite the fact that the colloquy shows that the juror failed to abide by the trial court's directive during voir dire, Nicholas objected to removal of the juror, arguing that there was no juror misconduct because the State had not asked a question to elicit information about the juror's acquaintance with the defendant. Nicholas also argued that the juror had stated that he could be fair and impartial. Because, like Nicholas, the juror was African-American, Nicholas argued that the juror would be able to understand the jargon of the recorded conversations played for the jury. The trial court removed the juror from the case after concluding that he had concealed information which, if disclosed, would have been material to whether the juror would have been challenged. The court noted that another African-American juror remained in the jury, even though the juror's race would be irrelevant if misconduct was established. A previously selected alternate juror was ultimately substituted.[5] Under these circumstances, we find no abuse of discretion in the trial court's decision to remove the juror.
We begin our analysis with some general principles. Florida Rule of Criminal Procedure 3.280(a) provides for the selection of alternate jurors to replace jurors *303 who become unable or disqualified to perform their duties prior to the time the jury retires to deliberate. As a general rule, "[t]he conduct of jurors is the responsibility of the court and the court is allowed discretion in dealing with any problems that arise." Orosz v. State, 389 So.2d 1199, 1200 (Fla. 1st DCA 1980); see generally Jennings v. State, 512 So.2d 169, 173 (Fla.1987) ("The trial judge has broad discretion in deciding whether a juror may sit."); State v. Williams, 465 So.2d 1229, 1231 (Fla.1985) ("The trial judge hears and sees the prospective juror and has the unique ability to make an assessment of the individual's candor and the probable certainty of his answers to critical questions presented to him. This is why a trial court has broad discretion regarding juror bias[.]"); Wiley v. State, 427 So.2d 283, 286 (Fla. 1st DCA 1983) ("The trial court has broad discretion in removing a juror[.]").
"`A juror who falsely misrepresents his interest or situation, or conceals a material fact relevant to the controversy, is guilty of misconduct[.]'" De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995) (quoting Loftin v. Wilson, 67 So.2d 185 (Fla.1953)); see also James v. State, 843 So.2d 933, 936 (Fla. 4th DCA 2003) ("Generally, juror misconduct issues arise where a juror conceals a material fact during voir dire."). Thus, a juror's concealment of material information during voir dire provides good cause for removal of that juror mid-trial and substitution with an alternate juror. See, e.g., Wilson v. State, 608 So.2d 842, 843 (Fla. 3d DCA 1992) (finding dismissal of juror and replacement with alternate mid-trial proper); see also State v. McGough, 536 So.2d 1187, 1189 (Fla. 2d DCA 1989) ("In addition to an untruthful response on voir dire, a juror's concealment of information which may have been material to whether that juror would be excused by peremptory challenge or for cause, when such concealment is not revealed or discovered until after trial, can in certain circumstances justify the granting of a new trial."); State v. Tresvant, 359 So.2d 524, 526 (Fla. 3d DCA 1978) (stating that juror's concealment of material information which is not revealed until after trial may be grounds for a new trial). A fact is considered material "if it exposes an inherent bias in favor of or against either party." James, 843 So.2d at 936.
There is no published opinion with facts so analogous to the facts of this case as to easily dispose of the issue on appeal here. However, in Wilson the State had asked the entire venire whether they could be impartial. 608 So.2d at 843. A particular juror did not respond to that question, nor did she ask for a side-bar. Id. During trial, the court was made aware of a potential problem with that juror. Id. When the court questioned the juror, she stated that "the State Attorney's Office was trying to do something to her mother that was unfair[,]" but that she could still be fair and impartial as a juror in the case. Id. The trial court removed the juror and replaced her with an alternate. Id. The defendant argued the trial court had erred in dismissing the juror after the start of testimony. The Third District concluded that the trial court had "properly resolved the problem." Id.
In Lebron v. State, 724 So.2d 1208, 1209 (Fla. 5th DCA 1998), the trial court during voir dire asked the jury panel generally whether they knew anything about the case and specifically whether they knew the defendant. A particular juror did not answer either question in the affirmative. Id. No one specifically asked the prospective jurors if they knew the victim. The trial court then directed the panel, "if at any time something jogs your memory that you recall, something about this case, please raise your hand and interrupt at *304 any time and let us know so we can talk with you." Id. It was later discovered that the juror at issue had not disclosed that the victim was his friend. Id. When questioned, the juror claimed he did not realize until the night before deliberations began that the defendant might be the one who shot his friend. Id. at 1210. When asked why he had not disclosed the information, the juror responded: "I didn't lie to you. I didn't know anything about him or the case. I said I thought, you see what I am saying? I didn'tI don't know for sure." Id. at 1209. The appellate court concluded that the juror's failure to disclose his knowledge constituted prejudicial juror misconduct. Id. The juror had "the continuing duty throughout the trial to advise the court if he recalled anything about the case." Id. at 1210. Had the juror disclosed the information before the jury began deliberations, an alternate juror could have taken his place, preserving the integrity of the process. Id.
Consistent with these principles, it is appropriate to remove a juror who has been less than candid during voir dire. See, e.g., Wilson, 608 So.2d at 843; Tresvant, 359 So.2d at 524 (finding that trial court did not abuse its discretion in removing juror who made only partial disclosure about her arrest record during voir dire because that information was material); Minnis v. Jackson, 330 So.2d 847, 848 (Fla. 3d DCA 1976) ("The well established rule is that the failure of a juror to honestly answer material questions propounded to him on voir dire constitutes bad faith requiring his disqualification from serving on the jury in the case.").
Here, the fact that the juror in question knew both Nicholas and a key witness and that he might have purchased drugs from Tamiko James and/or might have smoked marijuana with himwas relevant and material because it could have exposed an inherent bias or sympathy in favor of Nicholas. The juror's vehement denial of the drug-related allegations only complicated the analysis, especially when coupled with the juror's selective reasoning for not disclosing his prior acquaintance with Nicholas and Tamiko James, and his comment that he was a "peer" of Nicholas. It does not take a "mentalist" to discern from the juror's responses to the trial court's colloquy that he had immediately recognized Nicholas' and Tamiko's names from the information, that he listened to the voir dire questions waiting to be asked a question other than whether he was related to Nicholas "by blood or marriage," and that he had considered whether to disclose his knowledge of Nicholas and Tamiko James, but decided on his own that he did not need to disclose that knowledge, thereby ignoring the court's directives. The juror's failure to be completely candid during jury selection in this case precluded the State from inquiring into his rationalization. See generally Story v. State, 53 So.2d 920, 922 (Fla.1951) (affirming denial of new trial where juror gave an incomplete answer during voir dire because, in that case, the juror's answer did not conceal legal grounds for disqualification, but noting that "`[a] juror does not possess the right to pass upon the question of what is or what is not deemed material by the court, or the litigants, touching his qualifications to serve in a particular case.'") (quoting United States v. Lampkin, 66 F.Supp. 821, 824 (S.D.Fla.1946)). Additionally, the State did not have to accept at face value the juror's assertion that he could be fair and impartial. The end result was that the State was impaired in its ability to intelligently decide whether the juror should be challenged during voir *305 dire.[6] We also note that the State alleged that the juror was acting in a peculiar manner, making "extreme" eye contact with Nicholas' family.
While there may be room for reasonable people to disagree about the juror's good faith intent and his claimed ability to be fair and impartial, these are not relevant considerations when a juror has concealed materially relevant information during voir dire. If a juror conceals relevant and material information, his subsequent claim that he can be fair and impartial is of no moment. See generally Wilson, 608 So.2d at 843 (affirming dismissal of juror who did not disclose during voir dire that "the State Attorney's Office was trying to do something to her mother that was unfair" and then, when questioned mid-trial about that, claimed that she could still be fair and impartial).
Voir dire is intended to obtain an impartial jury, and "impartiality requires not only freedom from jury bias against the accused and for the prosecution but also freedom from jury bias against the prosecution and for the accused." Moody v. State, 418 So.2d 989, 993 (Fla.1982). "`It is the duty of a trial court to see that defendants in criminal cases are tried by a jury such that not even the suspicion of bias (leaning) or prejudice (prejudgment) can attach to any member thereof.'" Elliott v. State, 77 Fla. 611, 82 So. 139, 142 (1919) (emphasis added) (quoting Jacobs v. State, 1 Ga.App. 519, 57 S.E. 1063 (1907)). Thus, if there is any reasonable doubt as to whether a particular juror can render an impartial verdict based solely on the evidence presented and the law announced at trial, that juror should be removed, even if the juror affirmatively states that he can be impartial. See Graham v. State, 470 So.2d 97, 97-98 (Fla. 1st DCA 1985) (citing Singer v. State, 109 So.2d 7 (Fla.1959)). The trial court had the best overall vantage point to determine if the juror held a bias in favor of, or against, one of the parties. See Williams, 465 So.2d at 1231; see generally Sims v. State Farm Mut. Auto. Ins. Co., 748 So.2d 383, 384 (Fla. 3d DCA 2000) ("The trial court was in the best position to determine the credibility of the jurors' responses and we decline to disturb the court's ruling.").
The trial court in this case was placed in a predicament.[7] Tamiko James was Nicholas' brother, and was testifying that he had sold on consignment cocaine which he obtained from Nicholas. Aware of Tamiko James' allegations that the juror had smoked marijuana with him, had purchased marijuana and cocaine from him, and had been to his house at least once in the past, if the court did not remove the juror, there would be a lingering question as to whether the juror's prior knowledge and interaction with Tamiko and Nicholas influenced the verdict. This concern would exist regardless of whether Nicholas was convicted or acquittedi.e., if Tamiko James' allegations were in fact true, was the jury's decision to acquit or to find Nicholas guilty influenced in any way by this particular juror's external knowledge of Tamiko James' prior drug use or sales? On these facts, there was doubt as to whether the juror could render an impartial verdict and the trial court was justified *306 in removing the juror,[8] thereby dispelling any suspicion of bias or prejudice.[9] To address a concern expressed by the dissent, nothing in this case suggests that the trial court removed the juror to "place a judicial thumb on the scales of justice by altering the jury's composition" after it began hearing the evidence, or to change the outcome of the case.
The primary differences between the dissent and our holding relates to whether the State exercised due diligence in questioning the venire, and whether the trial court was constrained by rule or case law from exercising its discretion to find juror misconduct under the facts of this case. We do not disagree with the dissent's opinion that the prosecutor should ask the questions it deems important to enable it to select impartial jurors. However, we disagree with the dissent's implication that a party cannot, as happened here, rely on jurors' answers to the trial court's questions that garner the same information as if that party had asked the pertinent questions. This is a common procedure used in jury selection. In our view, for purposes of due diligence, it does not matter who poses the questions; the issue is whether the question should have elicited the information at issue and whether the juror's answers to voir dire reveal concealment.[10] Although it might have been easier for us to review the trial court's discretionary decision on the issue of juror concealment if the question of familiarity with Nicholas or Tamiko James had been specifically asked of the jurors, we cannot say the trial court abused its discretion in finding concealment in this case. In matters of interpretation, appellate courts are required to defer to a trial court's reasonable assessment and handling of problems that arise during trial. The dissent emphasizes that the juror did not reveal his prior acquaintance with Tamiko James or Nicholas because he had only been asked if he was related to Nicholas by blood or marriage. This overlooks the fact that the juror recognized Nicholas' and Tamiko James' names from the information but ignored the trial court's general query during voir dire, deciding instead that he did not need to disclose that he knew Nicholas and Tamiko James.
The dissent also relies on the temporal remoteness of the juror's connection with Nicholas and Tamiko James, based upon extrapolation of assumptions related to age. Although we do not believe it appropriate to engage in such speculation, had the trial court declined to remove the juror on such basis, we would have also been compelled to affirm because the trial court's discretion would have been exercised consistent with its reasonable analysis. See, e.g., Bigham v. State, 995 So.2d 207, 215 (Fla.2008) (finding no error in the trial court's decision to allow a juror to *307 remain in the jury panel and finding no concealment of material information where juror voluntarily came forward as soon as he recognized a testifying witness as an acquaintance and the juror's past conversations with the witness had been brief, distant, and had no relation to the witness's job as a detective).
Finally, we do not engage in harmless error analysis in this opinion because given our conclusion that there was no error, any harmless error discussion would be dicta.
Affirmed in part; reversed in part; remanded with directions.
CRENSHAW, J., Concurs.
WALLACE, J., Concurring in part and dissenting in part with opinion.
WALLACE, Judge, Concurring in part and dissenting in part.
During the voir dire examination at Nicholas' trial, no one asked the members of the venire if they knew Nicholas or any of the prospective witnesses. The majority holds that one of the members of Nicholas' jury committed misconduct by failing to volunteer that he was acquainted with Tamiko James and Nicholas. But a juror does not conceal information when the juror accurately answers the questions propounded to the juror during voir dire, and because the State failed to use due diligence in seeking the information, the juror was not guilty of misconduct.
For these reasons, I respectfully dissent from the majority's approval of the trial court's removal of the juror. I would reverse Nicholas' judgment and sentence for conspiracy to traffic in cocaine and remand for a new trial on that charge. I concur in the balance of the majority opinion.
My reading of the record in this case differs from the majority's perspective in several respects, and I have stated the pertinent facts in some detail before discussing the legal issues.

I. THE FACTS

A. The Charges, the Verdicts, and the Sentences
The charges against Nicholas and his codefendants arose out of an investigation conducted by the Tampa Police Department from May 2005 through October 2005. The investigation targeted a number of individuals believed to be involved in the distribution and sale of cocaine in the Tampa area. Several of the targets were related to each other. The investigation culminated in the filing of a twenty-count information, naming sixteen individual defendants.
Nicholas was named as one of the defendants in counts one through four of the information. These charges included racketeering (count one); conspiracy to engage in racketeering (count two); trafficking in cocaine, 400 grams or more but less than 150 kilograms (count three); and conspiracy to traffic in cocaine, 400 grams or more but less than 150 kilograms (count four). Each of the crimes charged is a first-degree felony. § 893.135(1)(b)(1)(c), (5); § 895.03(3), (4), Fla. Stat. (2005). The jury was unable to reach a verdict on counts one and two, and the State subsequently nolle prossed those counts. The jury found Nicholas guilty on counts three and four. But it found that the quantity of cocaine involved in the trafficking and conspiracy to traffic charges was the lesser amount of 200 to 400 grams instead of 400 grams to 150 kilograms.
The trial court adjudicated Nicholas guilty in accordance with the jury's verdict[11] and sentenced him to a term of *308 twenty years for each offense, concurrent, with a seven-year mandatory minimum. It also imposed the required $200,000 fine.

B. The Trial
The trial court tried the charges against Nicholas and two of the other fifteen defendants in a joint trial. Because Nicholas had made out-of-court statements that were inadmissible against the other two defendants, the trial court ruled that two separate juries would be used to try the caseone for Nicholas and another for the two other defendants. The lawyers selected the jury for the two other defendants first and then selected the jury that would hear the charges against Nicholas.
The State's case against Nicholas and the other two defendants was based largely on the testimony of two of their codefendants, Sidney Deloch and Tamiko James. Deloch is Nicholas' cousin; Tamiko James is his brother. Before trial, Deloch and Tamiko James both entered open pleas to the charges against them and agreed to cooperate with the State and to testify at the trials of their codefendants. Each man admitted to having six prior felony convictions. Because of the nature of the multiple charges against them and their extensive prior criminal records, both Deloch and Tamiko James faced the possibility of being sentenced to lengthy prison terms. Both men candidly admitted in their trial testimony that they hoped to obtain leniency at sentencing in exchange for their cooperation. Tamiko James, who was released from jail on bond, also acknowledged that he was receiving cash payments from the Tampa Police Department.
The trial began on a Monday and lasted four days. At the beginning of jury selection in the Nicholas case, the trial court asked the venire several questions. One of these questions was, "[A]re any of you related by either blood or marriage to the defendant in this case, James Nicholas?" The members of the venire responded in the negative. The trial court did not ask the members of the venire either individually or collectively whether they were acquainted with Nicholas or the prospective witnesses in the case. Neither the prosecutor nor defense counsel asked these questions either.

C. The State's Request to "Strike" the Juror
Tamiko James testified on Tuesday afternoon, the second day of the trial. During a break in his testimony, the prosecutor moved to "strike" a juror from the jury panel whom Tamiko James reportedly recognized while testifying. Before ruling, the trial court properly agreed to interview both Tamiko James and the juror outside the presence of the other members of the jury.
The transcript of the interviews reveals that the prosecutor believed that the juror had been asked during voir dire if he was acquainted with Nicholas and Tamiko James and that the juror had responded in the negative. In support of her motion, the prosecutor initially asserted: "Tamiko James, [the juror] knows him. [The juror] knows [Nicholas]. [The juror] obviously has past experience with him. When he was asked about that he obviously said he didn't."[12] (Emphasis added.)
*309 The trial court conducted the interview with Tamiko James first. After the interview with Tamiko James was completed, the prosecutor reiterated her understanding that the venire had been asked: "Does anyone know these people[?]" At this point, the trial court and defense counsel pointed outcorrectlythat the question posed was whether anyone was related to the defendant "by blood or marriage." However, when it was her turn to question the juror, the prosecutor again accused him of failing to respond honestly and completely to the questions posed during voir dire. The prosecutor interrogated the juror as follows: "Okay. Okay. I just, I'm just confused about why you wouldn't have told us this when we asked if you knew anybody?" The juror responded: "No. You asked if I was in their family." The juror's recollection was correct. The trial court again reminded the prosecutor that the question posed had been if they were "[r]elated by blood or marriage."[13]
The interviews with Tamiko James and the juror revealed that the nature of the contacts between Tamiko James, Nicholas, and the juror were both remote in time and limited in nature. The only connection established between them was that the juror had attended the same junior high school or high school that the two brothers had attended. We do not know the juror's age. However, Tamiko James was thirty-two years old at the time of trial; Nicholas was thirty. Thus the three men's last contact in high school could not have occurred more recently than twelve years before the trial. The juror testified that he had not seen Tamiko James in seven or eight years. More important, the juror repeatedly affirmed that he could be fair and impartial. When the prosecutor questioned the juror on this subject, the juror responded: "Well, I mean, whether I know [Tamiko James and Nicholas] or not has nothing to do with being fair or not."
In the interviews, Tamiko James claimed that he had sold cocaine and marijuana to the juror and had smoked marijuana with him. The juror denied these claims and also denied using drugs. The trial court made no findings concerning Tamiko James' assertions about selling drugs to the juror and smoking marijuana with him. This court is certainly not in a position to resolve these disputed factual issues. Nevertheless, the majority is inclined to accept what it calls Tamiko James' "revelations" at face value. In my view, this credulous approach to Tamiko James' questionable claims is unwarranted, not only because of the absence of any findings on this subject by the trial court but also in light of Tamiko James' agreement to testify against his brother in the hope of receiving leniency at sentencing, his six prior felony convictions, and his receipt of cash payments from the law enforcement department that was responsible for investigating the case.
After the prosecutor completed her interrogation of the juror, the trial court summed up by stating that the juror had "indicated he can be fair and impartial." *310 At this point, the juror said: "That would just indicate it is a jury of peers, correct?" The trial court responded: "I suppose. Thank you, sir." When the prosecutor mentioned this statement the next day during the argument on her motion, the trial court acknowledged, "Yes, he did make that statement." But the trial court did not comment on the statement or place any reliance on it in ruling to remove the juror.

D. The Parties' Arguments and the Trial Court's Ruling
After the interviews, the trial court took the State's motion to "strike" the juror under advisement and gave the parties an opportunity to perform legal research and to prepare their arguments. The trial court took up the issue again on Wednesday morning before testimony resumed. The trial court summarized the information developed at the interviews the prior afternoon as follows:
There was an indication from the witness, Tamiko James, that he knew [the juror], that [the juror] went to school with him and also was in the same school or with the defendant Mr. Nicholas. Mr. Tamiko James also made an implication that he had done drugs with [the juror] and that [the juror] had, I think, bought drugs from him and that had occurred back in the nineties.
The Court inquired of [the juror] in a private bench conference and [the juror] admitted recognizing Mr. James and that they had gone to school together or were in school around the same time together. He denied, of course, any drug usage and was naturally, I think, taken aback by the accusation and a little defensive about it, as I think anybody would be.
The trial court then invited the parties to make their arguments.
The prosecutor argued that the trial court had the discretion to dismiss the juror because he knew Tamiko James and Nicholas. The prosecutor said that if she had known that the juror was acquainted with the two brothers, she would have exercised a peremptory challenge to strike him. Finally, the prosecutor suggested that the interview with the juror had become "somewhat ... confrontational." She expressed concern that the interview "may now have caused some ill will on behalf of the juror either against the State or the Court or, I don't know."
Defense counsel objected strenuously to the removal of the juror and made several arguments in opposition to the motion. First, the removal of the juror was unwarranted because the juror was not guilty of any misconduct. He had truthfully answered all questions put to him during voir dire. Also, the juror had repeatedly affirmed his ability to be fair and impartial. Second, the State was not entitled to the removal and replacement of the juror with an alternate because the prosecutor had failed to ask him any questions about his prior acquaintance with Nicholas or the prospective witnesses. Third, defense counsel pointed out that Nicholas and the juror were both African-American males. The alternate slated to replace the juror if he were removed was a white male. Thus the State's belated attempt to strike the juror after announcing its acceptance of the panel would alter the composition of the jury to Nicholas' detriment. Finally, in response to the suggestion that the interview with the juror had become "confrontational," defense counsel pointed out that the juror's reaction resulted from the prosecutor's attempt
to instigate a juror that you don't want to be on the jury into saying something in front of the Judge but can't get him to do it and keep pushing that envelope to *311 where you feel now he's got a problem with you that's neither Mr. Nicholas' fault, the juror's fault[,] or the defense[']s fault.
After hearing the attorneys' arguments, the trial court ruled that the "juror did conceal information which may have been of materiality as to whether the juror could be excused on a peremptory challenge or for cause."[14] Based on this ruling, the trial court announced that it would remove the juror and replace him with one of the alternates. The trial court also noted that "there remains an African American female on the jury, not that I think that's an issue one way or the other." Defense counsel promptly moved for a mistrial. The trial court noted that there was a suitable alternate juror available and denied the motion for mistrial.

II. FLORIDA RULE OF CRIMINAL PROCEDURE 3.280(a) AND ITS LIMITATIONS
Procedures for alternate jurors are controlled by Florida Rule of Criminal Procedure 3.280. The rule provides, in pertinent part, as follows:
(a) Selection. The court may direct that jurors, in addition to the regular panel, be called and impanelled to sit as alternate jurors. Alternate jurors, in the order in which they are impanelled, shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to perform their duties.

(Emphasis added.) The language of the rule limits the trial court's power to replace members of the jury panel with an alternate to circumstances where a panel member is either unable or disqualified to perform his or her duties. In reviewing cases applying rule 3.280(a), a question arises as to whether the limitations in the rule are merely advisory on a court or enforceable by a defendant. Stated differently, one may ask if the rule's limitations reflect that a defendant has a protected interest in the chosen jury through the end of the trial. Although a comprehensive discussion of this issue is beyond the scope of this opinion, I submit that a defendant does have a protected interest in a chosen jury and that this interest should weigh significantly in any decision that impacts the composition of the jury once impanelled.[15]
During the jury selection process and before the jury is sworn to try the criminal defendant has no right to have any particular juror or jurors serve. Instead, the defendant is only entitled to a fair and impartial jury. See Lambrix v. Dugger, 529 So.2d 1110, 1112 (Fla.1988) (citing Piccott v. State, 116 So.2d 626 (Fla. 1959)); see also Bailey v. Deverick, 142 So.2d 775, 777 (Fla. 2d DCA 1962) (citing Piccott, 116 So.2d 626, and applying the rule in a civil case). But once the jury has been impanelled, the defendant has a protected interest in having the chosen jury decide his or her case. As the United States Supreme Court has explained, this right is protected by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution:
The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a *312 chosen jury. That interest was described in Wade v. Hunter, [336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949) ], as a defendant's "valued right to have his trial completed by a particular tribunal." 336 U.S. at 689, 69 S.Ct. at 837. It is an interest with roots deep in the historic development of trial by jury in the Anglo-American system of criminal justice. Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict.
Crist v. Bretz, 437 U.S. 28, 35-36, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (footnote omitted). The criminal defendant's protection against being twice put in jeopardy for the same offense under the United States Constitution and article I, section 9, of the Florida Constitution means that "[t]he defendant has a right to have his trial completed by a particular jury of his choosing." Douglas v. State, 28 So.3d 931, 933 (Fla. 3d DCA 2010) (citing Thomason v. State, 620 So.2d 1234 (Fla.1993)). Thus, if a criminal trial has commenced and the State is unable to prove its case, the defendant's interest in having his trial completed by the particular jury he has chosen prevents the trial court from declaring a mistrial to permit the State to put the defendant on trial again before a different jury. Similarly, the defendant's right to have his trial completed by the particular jury he has chosen limits the trial court's power to remove a member of the jury panel arbitrarily or for an improper purpose.
In considering Federal Rule of Criminal Procedure 24(c), which is comparable to rule 3.280(a), one federal court explained the reason for the limitations on a trial court's power to remove jurors in the middle of a trial as follows:
Like the unjustified declaration of a mistrial, the unjustified replacement of an empaneled juror may jeopardize the defendant's rights regardless of the judge's precise motivation, and whether or not the judge is biased or acting in bad faith. Wisely, Rule 24(c) therefore does not merely forbid the replacement of jurors on inappropriate grounds. Instead, the Rule protects the defendant's jury trial rights by specifying the only acceptable reasons for removal: incapacity and disqualification. The premise is that an empaneled juror, having passed voir dire examination and the parties' peremptory challenges, will serve to the end of trial unless compelling reasons require the juror's premature discharge. This approach, which adheres to the common-law rule, is prophylactic; it minimizes the chance that the trial court will, intentionally or unintentionally, place a judicial thumb on the scales by altering the jury's composition after it begins to hear the evidence.
Hinton v. United States, 979 A.2d 663, 682 (D.C.2009) (en banc) (footnote omitted).

III. MISCONDUCT AND CONCEALMENT: THE DE LA ROSA TEST
Here, it was error for the trial court to remove the juror unless he was unable to continue to serve or was disqualified. There is no contention that the juror was unable to continue to serve. In fact, after the trial court had ruled on Wednesday morning that the juror would be removed, he remained on the jury until Thursday afternoon when the jury retired to deliberate. Thus the trial court erred in removing the juror unless he became disqualified for misconduct. See Washington v. State, 955 So.2d 1165, 1172 (Fla. 1st DCA 2007).
The concealment by a juror of material information during voir dire is a form of misconduct. A juror's concealment of material *313 information during voir dire may warrant relief in the form of the removal of the offending juror or a new trial. The question of whether a juror has concealed material information during voir dire so as to warrant the juror's removal or the grant of a new trial is subject to the three-part De La Rosa test:
First, the complaining party must establish that the information is relevant and material to jury service in the case. Second, that the juror concealed the information during questioning. Lastly, that the failure to disclose the information was not attributable to the complaining party's lack of diligence.
De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995). Although De La Rosa is a civil case, the three-part test also applies in criminal cases. See Murray v. State, 3 So.3d 1108, 1121-22 (Fla.2009); Marshall v. State, 664 So.2d 302, 304 n. 2 (Fla. 3d DCA 1995). An examination of the three prongs of the De La Rosa test will be instructive for the analysis of the legal issues concerning the removal of the juror in this case.

A. Relevancy and Materiality
A juror's concealment of information during voir dire does not necessarily amount to misconduct warranting relief. "Pursuant to De La Rosa's first prong, the complaining party must establish not only that the nondisclosed matter was `relevant'... but also that it is `material to jury service in the case.'" Roberts v. Tejada, 814 So.2d 334, 339 (Fla.2002) (quoting De La Rosa, 659 So.2d at 241). A juror's nondisclosure of information is considered material where "the omission [of the information] prevented counsel from making an informed judgmentwhich would in all likelihood have resulted in a peremptory challenge." De La Rosa, 659 So.2d at 242 (quoting Bernal v. Lipp, 580 So.2d 315, 316-17 (Fla. 3d DCA 1991)).
The question of whether a juror's acquaintance with a witness or a party is relevant and material depends on the circumstances. For example, a juror answered in the negative when he was asked on voir dire "if he was related to or close friends with any law enforcement officers." Bigham v. State, 995 So.2d 207, 215 (Fla. 2008). Once the testimony began, the juror informed the court that he recognized one of the State's witnesses, a police officer. Id. However, the juror's acquaintance with the officer was only casual; they were not close friends. Id. In addition, the juror's contacts with the police officer had ended five to seven years before the trial. Id. On these facts, the Supreme Court of Florida held that the defendant was not entitled to a new trial becauseamong other thingsthe juror's acquaintance with the police officer was so casual and remote in time that it was not material. Id.
Similarly, this court held that the trial court did not commit error in allowing a juror to remain on the jury panel when the juror realized after voir dire examination that he was acquainted with the victim of a rape for which the defendant was on trial. Porter v. State, 214 So.2d 73, 73-74 (Fla. 2d DCA 1968). The juror's employment required him to service the refrigeration equipment where the victim was employed. Id. This court's opinion suggests that the information was not material because the juror's acquaintance with the victim was only casual. Id. In another case involving a casual acquaintance, the Supreme Court of Florida held that a trial court did not err in declining to grant a mistrial when one of the State's witnesses announced after testifying that he recognized one of the jurors as a person he had become acquainted with at a bar the witness frequented. DuBoise v. State, 520 So.2d 260, 264 (Fla.1988).
*314 On the other hand, where a juror in a criminal case failed to disclose when asked that he had previously been represented by the state attorney, the supreme court held that the defendant was entitled to a new trial. White v. State, 129 Fla. 885, 176 So. 842, 844-45 (1937). The prior representation of the juror by the attorney responsible for prosecuting the defendant was obviously relevant and material to the juror's service in the case. Id. at 844.

B. Concealment
Concealment occurs when a juror fails to disclose information in response to a question or questions propounded during voir dire. For example, after a juror had been sworn, she revealed that on her juror questionnaire she had concealed material information about the crimes of which she had been a victim. Garrido v. State, 955 So.2d 1195, 1196 (Fla. 3d DCA 2007). Because of the juror's concealment of material information, the Third District held that the trial court erred in refusing to remove the juror and declare a mistrial. Id. The Fourth District reached the same result on similar facts in Mobley v. State, 559 So.2d 1201, 1202 (Fla. 4th DCA 1990) (reversing and remanding for a new trial when a juror denied being a victim of a crime upon being asked during voir dire and deprived the defendant of an opportunity to strike the juror with a peremptory challenge). The juror in the White case concealed material information; when asked, he failed to disclose that he had previously been represented by the state attorney. White, 176 So. at 844-45.
Conversely, there is no concealment when a juror accurately answers the questions propounded on voir dire. In the Bigham case, the juror answered in the negative when asked on voir dire "if he was related to or close friends with any law enforcement officers." Bigham, 995 So.2d at 215. The juror's contacts with the police officer that the juror recognized after the testimony began were both casual and remote in time. Id. In fact, the juror was neither related to nor a close friend of the officer. Thus, because the juror had accurately answered the question posed on voir dire, there was no concealment and the defendant was not entitled to a new trial. Id. In another criminal case, this court held that a juror did not falsely answer any questions about his wife's former employment with the state attorney's office. State v. McGough, 536 So.2d 1187, 1189 (Fla. 2d DCA 1989). The question propounded to the juror was whether his wife was employed outside the home. He truthfully answered, "Not at this present time." Id. The juror did not conceal the fact that his wife had previously worked for the state attorney's office because he was not asked about his wife's prior employment history.
Thus a juror discharges his duty on voir dire when the juror provides accurate information to the questions propounded by the court or counsel. A juror who truthfully answers the questions posed on the juror questionnaire, if any, and during voir dire does not commit misconduct even if additional questions might have yielded relevant and material information.

C. The Due Diligence Test
De La Rosa's third prong is known as the "due diligence" test. The supreme court has explained:
The "due diligence" test requires that counsel provide a sufficient explanation of the type of information which potential jurors are being asked to disclose, particularly if it pertains to an area about which an average lay juror might not otherwise have a working understanding. Thus, resolution of this "diligence" issue requires a factual determination *315 regarding whether the explanations provided by the judge and counsel regarding the kinds of responses which were sought would reasonably have been understood by the subject jurors to encompass the undisclosed information.
Roberts, 814 So.2d at 343. The due diligence test places the responsibility on counsel for obtaining information material to the exercise of a peremptory challenge, not on the trial court or on the members of the venire. It follows that a juror does not commit misconduct where the juror's omission to disclose relevant and material information results from counsel's lack of diligence in making the appropriate inquiries. See McGough, 536 So.2d at 1189; Blaylock v. State, 537 So.2d 1103, 1107 (Fla. 3d DCA 1988).

IV. THE APPLICATION OF DE LA ROSA TO THIS CASE

A. Relevancy and Materiality
One could argue that the information about the juror's prior acquaintance with Tamiko James and Nicholas was not relevant and material to the juror's service in this case. The question of the juror's alleged purchase of drugs from Tamiko James and smoking marijuana with him was never resolved one way or the other. The only facts that were established indicated that the three men were acquainted because they had attended the same junior high school or high school more than a decade before. The juror had not seen Tamiko James in seven or eight years. These contacts were certainly as limited in scope and even more remote in time than the juror's acquaintance with the police officer that was held not to be material in Bigham, 995 So.2d 207.
Nevertheless, the prosecutor stated that she would have exercised a peremptory challenge against the juror if she had been informed of the facts. The prosecutor also asserted that she had "race neutral reasons to strike [the] juror." In a prosecution such as this one, it is more likely than not that the prosecutor would have exercised one of her peremptory challenges against the juror if she had known that he was acquainted with Tamiko James and Nicholas because he had attended school with them years before. Also, the trial court found that the information "may have been of materiality." For these reasons, I will assume for the purpose of my analysis that the State satisfied De La Rosa's relevancy and materiality prong.

B. Concealment
As I have already explained, the prosecutor's motion to "strike" the juror was grounded on her misapprehension that the juror had failed to respond truthfully when asked if he knew Nicholas or any of the prospective witnesses. In fact, no one propounded this or any similar question. As the trial court and the juror himself pointed out, the question posed to the venire was whether any of them was related to the defendant by blood or marriage. The juror was not related to the defendant by blood or marriage, and he answered this question truthfully. There was no concealment because the juror's answers to the questions propounded on voir dire were accurate. See Bigham, 995 So.2d at 215; McGough, 536 So.2d at 1189.
The decision in Allen v. State, 493 So.2d 1080 (Fla. 1st DCA 1986), is on point. In Allen, a juror failed to inform the court that he was acquainted with the defendant's spouse. Id. at 1080. On appeal, the First District held that the juror's omission to inform the court did not raise an inference of juror misconduct because "no inquiry was made of the juror in this regard." Id. at 1080-81. In this case, as in Allen, no concealment occurred because no *316 inquiry was made of the juror concerning his acquaintance with the individual or individuals in question. Because no concealment occurred, the trial court erred in removing the juror and replacing him with an alternate.
The majority's conclusion that the juror concealed information rests on his purported violation of the trial court's "open-ended, general directive to all prospective jurors." In this directive, the trial court asked the members of the venire to be candid and forthcoming in their answers to counsel's questions. I expect that similar requests are commonplace in jury trials conducted in this state. The majority's conclusion rests on the proposition that when the trial court makes such an open-ended request to the venire, a juror conceals information when the juror fails to volunteer information that counsel might have found material if he or she had asked for it.
I offer two answers to the majority's claim. First, there is no authority in Florida law for such a proposition. A trial court's suggestion to members of the venire to be candid and forthcoming in their answers to counsel's questions does not alter Florida law concerning what constitutes concealment. And, as I have shown, no concealment occurs if a juror provides accurate answers to the questions that are actually propounded to the juror. The juror need not go further and volunteer additional information not called for by the questions. See id. at 1080-81.
Second, the majority's idea of concealment is at odds with courtroom practice and places an unrealistic burden on the venire members. Trial lawyers are trained and experienced in picking juries and trying cases. Lawyers are intimately familiar with the facts of a case they are about to try. Any trial lawyer worth his or her salt will have a good idea about what connections, associations, occupations, life experiences, and attitudes are material to picking a jury for a particular case. A large part of a trial lawyer's task is to determine and elicit from the members of the venire the information necessary to the intelligent exercise of challenges for cause and peremptory challenges.
On the other hand, most citizens summoned for jury duty will have little or no familiarity with the jury selection process. Although the lawyers know the facts of the case to be tried, the prospective jurors will know little or nothing about the case. A citizen called for jury duty cannot be expected to know what information will be significant to the lawyers for picking a jury in a particular case. A prospective juror is not required to read the lawyers' minds and volunteer information that he or she might imagine the lawyers would want to know. The responsibility for conducting an effective voir dire examination is on the lawyers, not the venire members. A citizen called for jury duty in a case the citizen knows little or nothing about ought not to be accused and found guilty of misconduct based on his or her failure to anticipate and volunteer information that a lawyer might want to know but failed to request. But this is the result the majority approves in this case.

C. The Due Diligence Test
The trial court also erred in removing the juror because the State was guilty of a lack of diligence in questioning the juror. As this court has previously stated, the due diligence prong is not satisfied "when the failure to disclose the potential juror's concealment or untruthfulness on voir dire was due to a lack of diligence by the complaining party." McGough, 536 So.2d at 1189. Inquiry into a potential juror's knowledge or acquaintance with the parties *317 and the prospective witnesses is a fundamental area of inquiry that should be pursued in almost every voir dire examination. See Anne M. Payne & Christine Cohoe, Jury Selection and Voir Dire in Criminal Cases, 76 Am.Jur. Trials 127, 206 (2000); Windle Turley, Voir Dire: Preparation and Execution, in The Litigation Manual: A Primer for Trial Lawyers 409, 414 (ABA 2d ed. 1989).
Here, the State was pursuing a major prosecution against Nicholas for racketeering and for three other first-degree felonies. Yet the prosecutor did not ask the members of the venire the most basic questions concerning whether they knew or were acquainted with Nicholas or any of the prospective witnesses. And contrary to the suggestion in the majority opinion, the trial court did not ask the venire members if they knew Tamiko James, Nicholas, or any of the prospective witnesses. Such a question by the prosecutor would not have been redundant, and the trial court did not place any limits on the parties' voir dire examination of the members of the venire.
The majority blames the juror for impairing the State "in its ability to intelligently decide whether the juror should be challenged during voir dire." I disagree. Unquestionably, it was the State's lack of diligence that resulted in its failure to obtain the information that it later deemed important enough to interrupt the trial and to move to "strike" one of the jurors whom it had accepted the day before. The juror's omission to provide the information was the direct result of the State's lack of diligence, and the result reached by the majority is in conflict with De La Rosa. The trial court erred in granting relief to the State by removing the juror when the failure to obtain the material information was the direct result of the State's lack of diligence. See Roberts, 814 So.2d at 343; McGough, 536 So.2d at 1189; Blaylock, 537 So.2d at 1107.

V. WILSON AND LEBRON

The majority relies heavily on the decisions in Wilson v. State, 608 So.2d 842 (Fla. 3d DCA 1992), and Lebron v. State, 724 So.2d 1208 (Fla. 5th DCA 1998), in support of its position. Because the facts in both of these cases meet the three-part De La Rosa test, they do not support the majority's approval of the trial court's ruling in this case.
In Wilson, the State asked the venire members whether they could be impartial. 608 So.2d at 843. Benadette Bryan, the juror in question, did not indicate that there was a reason she could not be an impartial juror. Id. Before the second day of testimony, another juror sent the judge a note about a potential problem with Bryan. Id. Bryan had expressed "ill feelings against the State Attorney's Office." Id. Upon inquiry by the court, Bryan said "that the State Attorney's Office was trying to do something to her mother that was unfair." Id. On the State's motion, the trial court dismissed the juror over the defendant's objection. Id. On appeal, the Third District held that the trial court had "properly resolved the problem by replacing Bryan with an alternate juror." Id.
In Wilson, the juror's "ill feelings against the State Attorney's Office" were obviously material to her service as a juror in the case. Id. The juror concealed her bias by failing to respond when asked about her ability to be impartial. And Bryan's failure to disclose her bias was not due to any lack of diligence by the State. The State made the requisite inquiry during voir dire. Thus the Wilson court's approval of the trial court's ruling removing juror Bryan was based on facts that met the three-part De La Rosa test.
*318 The facts in Lebron reveal a particularly egregious example of juror concealment. A jury found Lebron guilty of attempted murder, robbery, and kidnapping. 724 So.2d at 1209. Lebron moved for a new trial based on the misconduct of the jury foreperson, Kevin Wright. Id. Lebron alleged that Wright had "failed to timely disclose to the trial court his suspicion that Mr. Lebron had murdered his friend," Neal Oliver. Id. Before the trial, Wright had read a newspaper account naming Lebron as Oliver's killer. Id. The newspaper article included pictures of both Lebron and Oliver. Id. Lebron was subsequently charged with the murder of Oliver. Id.
During voir dire, the trial court asked the venire generally whether they knew anything about the Oliver case. Id. The trial court also asked the venire members specifically whether they knew Lebron. Id. None of the jurors said that they knew Lebron, but one of the jurors said that she had known Mr. Oliver. Id. That juror was excused for cause. Id. Other jurors said that they had heard or read about the case. Id. But Wright, who was Oliver's friend, did not inform the trial court or the parties that he knew anything about the case. Id. When defense counsel asked the venire if they knew of any reason that they could not be fair and impartial, Wright answered in the negative. Id. On the last day of trial, Wright's fiancée told defense counsel that Wright had discussed the case with her. Id. In an interview with the trial court conducted while the jury was deliberating, Wright's fiancée said that "Wright had told her that he thought Mr. Lebron was guilty." Id.
Wright's conduct unquestionably met the three-part De La Rosa test. Wright's friendship with the murder victim and his familiarity with newspaper accounts of the crime were obviously material to his service as a juror in the case. Wright failed to respond truthfully to direct questions designed to elicit this information. In addition to his concealment of facts material to his jury service, Wright was guilty of misconduct for discussing the matter with his fiancée while the case was still pending. Under these circumstances, the Fifth District properly reversed the trial court's order declining to grant Lebron a new trial. Id. at 1210.

VI. THE TRIAL COURT'S "PREDICAMENT"
The majority suggests that the State's motion to "strike" the juror placed the trial court in "a predicament." According to the majority, if the trial court did not remove the juror, "there would be a lingering question as to whether the juror's prior knowledge and interaction with Tamiko [James] and Nicholas influenced the verdict... regardless of whether Nicholas was convicted or acquitted." It is difficult to know what to make of this argument. The majority seems to suggest that the trial court was obligated to disregard the merits of Nicholas' objection to the removal of the juror and to grant the State's motion in order to ensure that Nicholas received a fair trial.
But the trial court was not in "a predicament." Nicholas' counsel strenuously objected to the removal of the juror and after an evening for research and reflectionpresented several arguments in support of his objection. Counsel for Nicholas acted in accordance with a well-considered strategy to keep the juror on the jury panel. In the event of a conviction, Nicholas would have had no ground for complaint either on direct appeal or on a postconviction motion if the trial court had sustained his objection to the removal and replacement of the juror.
Also, unlike the juror in Lebron, the juror in this case had no knowledge of the *319 facts of the case to be tried. The juror had known Tamiko James and Nicholas in school more than a decade before the trial; his most recent contact with Tamiko James had been seven or eight years earlier. Thus the juror had no "external knowledge" of the facts of the crimes for which Nicholas was on trial. The mere fact of the juror's remote acquaintance with Tamiko James and Nicholas did not disqualify him for service on the jury. See Bigham, 995 So.2d at 215; DuBoise, 520 So.2d at 264; Porter, 214 So.2d at 73.

VII. HARMLESS ERROR ANALYSIS
I now turn to the question of whether the error in removing the juror was harmless. "The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986) (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Thus the State has the burden on the issue of harmless error.[16]
Nicholas sustained discernible prejudice as a result of the removal of the juror. As Nicholas' counsel pointed out in the trial court, jurors are not fungible. Nicholas is an African-American male. The removed juror was the only African-American male on the jury. The replacement juror was a white male. Nicholas had not exercised all of his allotted peremptory challenges. Nicholas might have exercised an additional peremptory challenge, but he did not. This strategy ensured that the removed juror would remain on the jury. The trial court's ruling deprived Nicholas of the benefit of the strategy he had employed during jury selection by removing the lone African-American male from the jury.
The conclusion that Nicholas sustained prejudice as a result of the trial court's ruling leads to the question of whether the jury would have convicted him of conspiracy to traffic in cocaine anyway. After a thorough review of the record, I believe that the State's case on the conspiracy to traffic charge was not so strong that any reasonable jury would have returned a guilty verdict. Two facts lead me to this conclusion. First, the State's proof was based in substantial part on the testimony of the two cooperating codefendants, Deloch and Tamiko James. Each of these men had major credibility problems. Second, the jury was unable to reach a verdict on two of the four charges against Nicholas. The charges on which the jury was unable to reach verdicts were the charges of racketeering and conspiracy to engage in racketeering. Yet the facts and the legal issues involved in the charge of conspiracy to traffic were substantially similar to the facts and the legal issues involved in the charges of racketeering and conspiracy *320 to engage in racketeering. The split in the jury's verdicts suggests that the jury harbored doubts about Nicholas' asserted participation in the alleged drug trafficking conspiracy. Under these circumstances, I conclude that the State has not met its burden of demonstrating harmless error. Cf. Washington, 955 So.2d at 1172-73 (holding that the improper removal of a juror from the panel is not cured by the replacement of the juror with a duly selected alternate juror).

VIII. CONCLUSION
The majority's reasoning rests on the notion that the juror concealed information that he was never asked to provide. In effect, the majority concludes that the juror was guilty of misconduct because he was not clairvoyant. Because our jury venires are not drawn from the ranks of mediums, mentalists, and mind readers, I believe that the majority's holding on this issue is untenable.
NOTES
[1] Fifteen other defendants were also charged with various offenses arising out of the same investigation.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Notably, the State did not cite a single case supporting its argument that the evidence was legally sufficient to send the case to the jury on the issue of Nicholas' constructive possession of the cocaine found in the Morro Manor apartment.
[4] Tamiko James pleaded guilty to the charges against him before trial.
[5] The defense did not seek to exercise a peremptory challenge to sit a different alternate juror. The record does not reflect the race or gender of the remaining jury pool.
[6] Having concluded that the juror was appropriately removed for misconduct, any argument that removal of the juror had the result of erroneously reconfiguring the jury is inapplicable.
[7] In fact, Nicholas' counsel conceded that there was no published opinion exactly on point on the issue presented to the trial court.
[8] We note that the trial court did not actually remove the juror immediately upon making its ruling, but let him remain on the panel until the jury was sent to deliberate. The trial court dismissed the juror with its thanks for serving as an "alternate." Neither side objected to this methodology. While we do not endorse this approach, we do not find fault in it.
[9] This opinion should not be read as excusing a party's failure to ask relevant questions of prospective jurors, especially questions as basic as whether the prospective jurors are acquainted with the defendant or the witnesses in the case. We simply hold that, given the facts of this case, the overarching tenor of jury selection was such that a reasonable juror would have known that he had a duty to disclose his knowledge of this defendant and codefendant.
[10] This is particularly true in instances where trial judges do not allow redundant questions; nor should parties be required to prolong jury selection, at the risk of boring the panel, in order to establish "due diligence."
[11] The written judgment erroneously adjudicates Nicholas guilty of conspiracy to traffic in cocaine on counts three and four. The reference to conspiracy to traffic in cocaine with respect to count three is apparently a scrivener's error.
[12] In her preliminary remarks concerning her motion to "strike" the juror, the prosecutor also asserted "that while Tamiko James has been testifying that this particular juror has been ... making extreme eye contact with members of [Nicholas'] family and every time [the assistant state attorney] looks at him he looks away." The assistant state attorney who reportedly observed this behavior did not testify or otherwise address the court concerning her observations. Although the majority cites this allegation in support of the trial court's decision to remove the juror, the trial court did not make any findings about the State's eye-contact claim and did not rely on the claim in support of its ruling removing the juror.
[13] As noted above, two juries were selected at the trial of Nicholas' case, with the jury for Nicholas' case being the second selected. Thus the prosecutor may have become confused about what questions were actually asked during the voir dire for Nicholas' case.
[14] The trial court did not describe or otherwise identify the juror's behavior that formed the basis for its finding of concealment. When defense counsel asked the trial court to elaborate on this critical ruling, it declined to do so.
[15] For a discussion of this issue in depth, see Hinton v. United States, 979 A.2d 663, 670-83 (D.C.2009) (en banc). My analysis in this opinion follows Hinton to some extent.
[16] I acknowledge that several Florida cases suggest that the substitution of a duly selected alternate juror renders any error in removing a juror from the jury panel harmless. See, e.g., Newton v. State, 178 So.2d 341, 345 (Fla. 2d DCA 1965); Lowry v. State, 963 So.2d 321, 327 (Fla. 5th DCA 2007); Ortiz v. State, 835 So.2d 1250, 1251 (Fla. 4th DCA 2003); Graham v. State, 470 So.2d 97, 98 (Fla. 1st DCA 1985); State v. Tresvant, 359 So.2d 524, 526 (Fla. 3d DCA 1978). But the statements in these cases on the harmless error issue are dicta, and in each of these cases, the removal of the juror and substitution of an alternate was authorized under rule 3.280(a). See also Washington, 955 So.2d at 1173 ("It would make little sense to conclude that it is error to reconfigure the jury panel based on nothing more than the perceived impressions a juror holds about the case," and then conclude that "the error does no harm because the parties had previously selected the alternate juror.... [T]he reconfiguration of the jury panel is the very error that must be corrected.").